ACCEPTED
15-24-00040-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
7/2/2025 9:11 AM
CHRISTOPHER A. PRINE
CLERK

# HAYNES BOONE

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
7/2/2025 9:11:04 AM
CHRISTOPHER A. PRINE
Clerk

July 2, 2025

*Via Electronic Filing and FedEx*

Christopher A. Prine
Clerk of Court
Fifteenth Court of Appeals
William P. Clements Building
P.O. Box 12852
Austin, TX 78701

Re:  *State of Texas v. Yelp Inc.*, No. 15-24-00040-CV
     **Fifth Notice of Supplemental Authority**

Dear Mr. Prine:

Appellee Yelp Inc. ("Yelp") submits this Fifth Notice of Supplemental Authority ("Notice") regarding a pair of Texas Supreme Court cases recently decided that involve the issue of purposeful availment, which is one prong of the two-prong test for specific jurisdiction. The issue arose during oral argument and is addressed in the parties' briefs.

Yelp respectfully requests that a copy of this Notice be provided to Chief Justice Scott Brister, Justice Scott Field, and Justice April Farris.

## I. *BRP-Rotax GmbH & Co. KG v. Shaik*, No. 23-0756, 2025 WL 1727903 (Tex. June 20, 2025) (Ex. A)

In *BRP-Rotax*, a pair of Texas residents sued a non-resident aircraft engine manufacturer after being injured during a crash on a runway. The Texas Supreme Court found that the manufacturer did not purposefully avail itself of the privilege of doing business in Texas because the manufacturer lacked *direct* contacts with Texas and did not "*specifically target*" Texas. *Id.* at *1. The Court thus dismissed the case against the manufacturer. The Court's opinion affirms many of the bases for finding a lack of specific personal jurisdiction over Yelp in the above referenced case.

The Texas Supreme Court reiterated that the "stream of commerce-plus" test for purposeful availment *only* applies in product liability cases. *Id.* at *4. This directly contradicts the State's contention that the "stream of commerce-plus" test should be applied in this case. App. Br. at 21-22. This is not a products liability case; rather, it involves a single DTPA claim arising from a nationwide advisory, not products. Yelp Br. at 45.

As relevant to this case, the Texas Supreme Court explained that specific personal jurisdiction is based on the defendant's contacts with the forum state, *not* the unilateral activities of third parties. *Id.* at *8 (the "unilateral activity of another party or a third person is not an

appropriate consideration when determining whether a defendant has sufficient contacts for specific personal jurisdiction"). Accordingly, "only Yelp's contacts with Texas should be considered" in this case. Yelp Br. at 45-46. The acts of Yelp's users are irrelevant. App. Br. at 23.

The Court also reiterated that the "touchstone" of purposeful availment "remains directly targeting Texas." *Id*. at *8. In *BRP-Rotax*, the plaintiffs failed to allege that the manufacturer "specifically targeted Texas *at all*." *Id*. at *8. Here, the State failed to plead that Yelp specifically targeted Texas. Instead, the State concedes that Yelp "targeted pregnancy resources centers *nationwide*" and posted the Consumer Notice "on the Yelp business pages of every pregnancy center across the nation." Yelp Br. at 11 (emphasis added).

The Court also reaffirmed its previous observation that "a nonresident defendant may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction. *Id*. at *9 (internal quotations omitted). Likewise, Yelp has argued it "purposefully *avoids* the privileges of Texas by requiring users (such as any who might have viewed the Consumer Notice at issue here) to bring suit in California and be subject to California law." Yelp Br. at 53.[1]

The Court further found that the manufacturer's website was not "interactive" because engines could not be purchased off its website. *Id*. at *8. Likewise, the Consumer Notice was not interactive because it was merely information and "did not invite any commercial transactions with residents of Texas (or any other state)." Yelp Br. at 6, 46-47.

## II.    *Hyundam Indus. Co., Ltd. v. Swacina*, No. 24-0207, 2025 WL 1717010 (Tex. June 20, 2025) (Ex. B)

In *Hyundam*, a Texas resident sued a non-resident car manufacturer after suffering injuries when her car stalled in traffic resulting from a fuel pump failure. Like in *BRP-Rotax*, the Texas Supreme Court held that the manufacturer did not purposefully avail itself of the privilege of doing business in Texas because there was no evidence that the manufacturer "*specifically targets* Texas." *Id*. at *1. Instead, the manufacturer's conduct—designing a fuel pump for North America—was aimed at "a general region with no specific targeting of Texas." *Id*. at *5. The Court thus dismissed the case against the manufacturer.

Like the manufacturer, Yelp's conduct—posting the Consumer Notice—was aimed across America "with no specific targeting of Texas." *Id*. at*1. The State concedes this in its pleadings. CR 13 ¶ 28.

---

[1] The undisputed record also indicates that Yelp did not profit from the Consumer Notice. Yelp Br. at 51-53.

# HAYNES BOONE

For the above reasons, this Court should follow the guidance of the Texas Supreme Court and hold that Yelp is not subject to personal jurisdiction in Texas because, among other reasons, it did not purposefully avail itself of the privilege of doing business in Texas.

Respectfully submitted,

Laura Lee Prather
Partner, Haynes and Boone, LLP
Laura.prather@haynesboone.com
Direct Phone Number: (512) 867-8476
Direct Fax Number: (512) 867-8609

Attorney for Appellee Yelp Inc.

# EXHIBIT A

2025 WL 1727903
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED
FOR PUBLICATION IN THE PERMANENT
LAW REPORTS. UNTIL RELEASED, IT IS
SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Texas.

BRP-ROTAX GMBH & CO. KG, Petitioner,

v.

Sheema SHAIK and Touseef Siddiqui, Respondents

No. 23-0756
|
Argued December 4, 2024
|
OPINION DELIVERED: June 20, 2025

**Synopsis**
**Background:** Aircraft passenger injured when aircraft
suddenly lost engine power and crashed on the runway
brought, along with her husband, who witnessed the incident,
action on claims of strict products liability, negligence, and
gross negligence against Austrian company that designed and
manufactured the allegedly defective engine. After hearing,
the County Court at Law No. 5, Dallas County, Nicole Taylor,
J., denied Austrian company's special appearance challenging
personal jurisdiction. Company appealed. The Dallas Court
of Appeals, 698 S.W.3d 305, affirmed. Austrian company
petitioned for review.

**Holdings:** The Supreme Court, Young, J., held that:

[1] Austrian company's distribution with independent
Bahamian company that originally bought the engine could
not support finding specific personal jurisdiction over
Austrian company;

[2] distribution agreement's provision that Austrian company
had to provide specific written permission for Bahamian
company to use Austrian company's name could not support
finding specific personal jurisdiction over Austrian company;

[3] existence of Texas-based repair center could not support
finding specific personal jurisdiction over Austrian company;

[4] interactions that Texans had with Austrian company's
website could not support finding specific personal
jurisdiction over Austrian company;

[5] alleged "hundreds" of engines that third parties had
voluntarily registered as located in Texas could not support
finding specific personal jurisdiction over Austrian company;
and

[6] taken collectively, evidence showed that Texas courts,
under the stream-of-commerce-plus test, lacked personal
specific jurisdiction over Austrian company.

Judgment of Court of Appeals reversed; judgment dismissing
case against Austrian company rendered.

Busby, J., concurred and filed opinion, which Devine, J.,
joined.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Lack of Personal Jurisdiction.

West Headnotes (23)

**[1]** **Appeal and Error** 🔑
A defendant's amenability to specific personal
jurisdiction in Texas presents a question of law
that an appellate court reviews de novo. Tex. Civ.
Prac. & Rem. Code Ann. § 17.041 et seq.

**[2]** **Appeal and Error** 🔑
Where the relevant facts are undisputed,
an appellate court reviewing a defendant's
amenability to specific personal jurisdiction
in Texas, which presents a question of law,
considers only the legal question of whether
those facts establish Texas jurisdiction. Tex. Civ.
Prac. & Rem. Code Ann. § 17.041 et seq.

**[3]** **Courts** 🔑
A court must have personal jurisdiction over a
defendant to issue a binding judgment.

**[4] Courts** ⚷

Texas courts exercise personal jurisdiction over litigants by reference to the Texas long-arm statute and federal constitutional due-process guarantees; while allegations that a tort was committed in Texas satisfy the Texas long-arm statute, those allegations must also satisfy due-process requirements. U.S. Const. Amend. 14; Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2).

**[5] Courts** ⚷

There are two kinds of personal jurisdiction: general, sometimes called all-purpose, jurisdiction and specific, sometimes called case-linked, jurisdiction.

**[6] Courts** ⚷

Specific personal jurisdiction covers defendants less intimately connected with a State, but only as to a narrower class of claims than general jurisdiction would allow.

**[7] Courts** ⚷

To be subject to specific personal jurisdiction, the nonresident defendant must have taken some act by which it purposefully availed itself of the privilege of conducting activities within Texas, thus invoking the benefits and protections of its laws; second, the claims must arise out of or relate to defendant's Texas-focused activities. Tex. Civ. Prac. & Rem. Code Ann. § 17.041 et seq.

**[8] Courts** ⚷

Deliberate conduct that could support specific personal jurisdiction in Texas may come in the form of exploiting a market in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.041 et seq.

**[9] Courts** ⚷

For a nonresident defendant's activities to support the exercise of specific personal jurisdiction in Texas, the activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the nonresident defendant could reasonably anticipate being called into a Texas court with respect to a particular claim. Tex. Civ. Prac. & Rem. Code Ann. § 17.041 et seq.

**[10] Courts** ⚷

No specific personal jurisdiction exists over foreign manufacturer whose product just happens to end up in the forum state via the stream of commerce. Tex. Civ. Prac. & Rem. Code Ann. § 17.041 et seq.

**[11] Courts** ⚷

Mere awareness, or foreseeability, of a product's sale or distribution in Texas alone cannot create minimum contacts sufficient to support personal jurisdiction. Tex. Civ. Prac. & Rem. Code Ann. § 17.041 et seq.

**[12] Courts** ⚷

Stream-of-commerce-plus personal jurisdiction attaches only when the defendant targets the forum, not when the defendant merely foresees his product ending up there; in other words, the "additional conduct" must show targeting Texas in particular, not merely passive awareness of a likelihood—even a substantial likelihood verging on certainty—that products may eventually arrive in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.041 et seq.

**[13] Courts** ⚷

Distribution agreement that Austrian company that designed and manufactured allegedly defective aircraft engine had with Bahamian company that originally bought the engine could not support finding that Austrian company targeted Texas and thus could not support finding specific personal jurisdiction over

Austrian company as to lawsuit in which aircraft passenger injured in crash caused by allegedly defective engine was asserting claims of strict products liability, negligence, and gross negligence against Austrian company; Bahamian company was an independent company in which Austrian company held no ownership interest, Bahamian company had no distributors in Texas or even the United States, and nothing in agreement specifically directed marketing efforts to Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2).

More cases on this issue

**[14]    Courts** 

It is only the defendant's contacts with the forum that count when determining if specific personal jurisdiction exists. Tex. Civ. Prac. & Rem. Code Ann. § 17.041 et seq.

**[15]    Courts** 

As is relevant to specific personal jurisdiction, purposeful availment of local markets may be either direct, through one's own offices and employees, or indirect, through affiliates or independent distributors. Tex. Civ. Prac. & Rem. Code Ann. § 17.041 et seq.

**[16]    Courts** 

If a nonresident targets Texas by deploying others to achieve the goal, the outcome for purposes of specific personal jurisdiction is no different than if the nonresident targeted Texas directly. Tex. Civ. Prac. & Rem. Code Ann. § 17.041 et seq.

**[17]    Courts** 

Although distribution agreement that Austrian company that designed and manufactured allegedly defective aircraft engine had with Bahamian company that originally bought the engine stated that Austrian company had to provide specific written permission for Bahamian company to use Austrian company's

name, that could not support finding specific personal jurisdiction over Austrian company as to lawsuit in which aircraft passenger injured in crash caused by allegedly defective engine was asserting claims of strict products liability, negligence, and gross negligence against Austrian company; that particular contractual requirement had nothing to do with targeting any particular market. Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2).

More cases on this issue

**[18]    Trademarks** 

Trademark owner has duty to exercise control and supervision over licensee's use of mark.

**[19]    Courts** 

Existence of Texas-based repair center could not support finding specific personal jurisdiction over Austrian company as to lawsuit in which aircraft passenger who was injured in crash that was caused by allegedly defective engine that company designed and manufactured was asserting claims of strict products liability, negligence, and gross negligence against Austrian company; Austrian company's distribution agreement with Bahamian company, in which Austrian company held no ownership interest, showed that Bahamian company was wholly responsible for establishing the repair center, and Austrian company never directed Bahamian company to establish any center within Texas at all. Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2).

More cases on this issue

**[20]    Courts** 

Interactions that Texans had with website of Austrian company that designed and manufactured allegedly defective aircraft engine could not support finding specific personal jurisdiction over Austrian company as to lawsuit in which aircraft passenger who was injured in crash that was caused by allegedly defective engine was asserting claims of strict products

liability, negligence, and gross negligence against Austrian company; despite argument that the website and the engine manual downloaded from the website were written in English, use of English in a website and manual about airplane engines was not limited to the English-speaking world, nothing about website targeted Texas or Texans, and Austrian company's engines could not be purchased off of website. Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2).

More cases on this issue

**[21]** **Courts** 🔑

Alleged "hundreds" of engines that third parties had voluntarily registered as located in Texas could not support finding specific personal jurisdiction over Austrian company as to lawsuit in which aircraft passenger who was injured in crash that was caused by allegedly defective engine that company designed and manufactured was asserting claims of strict products liability, negligence, and gross negligence against Austrian company; there was no evidence of any sales of Austrian company's engines by anyone to anyone in Texas beyond the single engine at issue in the case. Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2).

More cases on this issue

**[22]** **Courts** 🔑

Taken collectively, evidence showed that Texas courts, under the stream-of-commerce-plus test, lacked personal specific jurisdiction over Austrian company as to lawsuit in which aircraft passenger who was injured in crash that was caused by allegedly defective engine that company designed and manufactured was asserting claims of strict products liability, negligence, and gross negligence against Austrian company; all of the evidence demonstrated that the engine came to Texas by the unilateral actions of third parties, i.e., evidence showed, among other things, that Austrian company's only relevant distributor was independent Bahamian company that had substantial discretion in marketing and advertising and that engines were voluntarily registered in Texas but were not delivered to Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2).

More cases on this issue

**[23]** **Courts** 🔑

As is relevant to personal jurisdiction, a nonresident defendant may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction. Tex. Civ. Prac. & Rem. Code Ann. § 17.041 et seq.

On Petition for Review from the Court of Appeals for the Fifth District of Texas

**Attorneys and Law Firms**

John M. Socolow, Jackie Robinson, Ralph Pagano, Wallace B. Jefferson, James M. Parker Jr., for Petitioner.

George S. Christian, for Amicus Curiae Texas Civil Justice League.

G. Don Swaim, Alex J. Whitman, M. Ross Cunningham, for Other interested party Piper Aircraft, Piper Sport, Excite Aircraft d/b/a US Sport Aircraft, & Patrick Arznen.

Andrew L. Payne, Shannon T. Hays, for Respondents.

**Opinion**

Justice Young delivered the opinion of the Court.

**\*1** We must decide whether Texas courts may exercise specific personal jurisdiction over BRP-Rotax GmbH & Co. KG, an Austrian company that designs and manufactures aircraft engines. The answer depends on our application of the so-called "stream-of-commerce-plus" test, under which Rotax is subject to jurisdiction in Texas only if it had an intent or purpose to serve the Texas market. But far from reflecting Rotax's purposeful availment, the record conclusively establishes the opposite. As we have repeatedly explained, the stream-of-commerce-plus test requires a defendant to *specifically target* Texas; it is not enough that

a defendant may foresee some of its products' eventually arriving here.

This case requires us to break no new jurisprudential ground. Under our precedents, the lawsuit against Rotax should have been dismissed for lack of personal jurisdiction, and the lower courts erred by instead proceeding with the litigation. We therefore reverse the judgment of the court of appeals and render judgment dismissing the case against Rotax.

**I**

Tragedy struck respondents Sheema Shaik and Touseef Siddiqui (together, the Shaiks) when a Piper Light Sport Aircraft suddenly lost engine power and crashed on the runway at an airport in Addison, Texas. Sheema, a passenger in the plane, suffered permanent and life-altering injuries. Touseef, her husband, witnessed the harrowing incident. As Texas residents injured in Texas, the Shaiks chose Dallas County as the place to adjudicate their claims and hold to account the numerous parties they believed responsible for their injuries. They asserted claims for strict liability, negligence, and gross negligence against the designer and manufacturer of the aircraft, the seller of the aircraft, and Rotax, which designed and manufactured the engine that lost power. The Shaiks initially sued multiple other parties, too, but dropped their claims against them in various amended petitions, leading to the sixth amended petition, which is their live pleading.

We are concerned today only with Rotax, which is headquartered in Gunskirchen, Austria. The Shaiks allege that Texas courts have specific personal jurisdiction over Rotax because it "intentionally placed" the allegedly defective engine "into the stream of commerce" and "moved it along" to Texas.

Rotax responded to the suit by filing a special appearance under Texas Rule of Civil Procedure 120a, requesting that the court dismiss the case against it for lack of personal jurisdiction. Rotax relied on a declaration from its general manager and vice president of sales who stated, among other things, that Rotax:

- designs and manufactures its engines exclusively in Austria;

- never contracted with the Shaiks or any other Texas resident for the sale, installation, or repair of its engines;

- does no business in Texas;

- has no employees in Texas;

- has no offices in Texas;

- does not own or lease any real property in Texas; and

- has never targeted any advertising or other marketing activities to Texas residents.

**\*2** The declaration further explained that Rotax sells its engines under distribution agreements with independent distributors, all of which are located not just outside Texas but outside the United States, and that Rotax does not provide direct product support for or repair Rotax engines.

Rotax sold the engine at issue here, for example, to Kodiak Research Ltd., a Bahamian company. Kodiak shipped the engine from Austria to the Bahamas. Kodiak then sold the engine to Lockwood Aviation Supply, Inc., its sub-distributor in Florida that was itself "an independent Service Centre located in Sebring, Florida," and Lockwood then sold the engine to U.S. Sports Aircraft, the Texas company that installed the engine into the plane that crashed.

The Shaiks concede that Rotax lacks a physical presence in or direct connection to Texas. They acknowledge the attenuated way in which the allegedly defective engine reached Texas. But they counter that Rotax had numerous—albeit indirect—contacts sufficient for Texas courts to exercise specific personal jurisdiction. Any one of these contacts, they say, is enough to show that Rotax made "deliberate and systematic attempts to establish a market" in Texas and that "Rotax has pervasively served [that] market for decades and has reaped substantial profits by doing so." Had Rotax wished to avoid litigation here, the Shaiks continue, it should have "taken affirmative action" and severed its connection to Texas, "just as it d[id] [with] Iraq, Iran, and North Korea" by expressly forbidding its independent distributors from shipping Rotax engines to those countries.

The trial court and court of appeals agreed. Affirming the trial court's denial of Rotax's special appearance, the court of appeals concluded that Rotax "purposefully availed itself of Texas under the 'stream of commerce-plus' test." 698 S.W.3d 305, 309 (Tex. App.—Dallas 2023). Its purposeful-availment analysis purportedly "focus[ed] on the relationship among the forum, the defendant, and the litigation," and so it discussed the distribution agreement between Rotax and

Kodiak; Rotax's website; a repair center in Bulverde, Texas, known as "Texas Rotax"; and the number of Rotax engines registered in Texas. *Id.* at 313–14.

But underlying the court of appeals' review of whether the trial court had specific personal jurisdiction over Rotax were the allegations that the Shaiks are Texas residents, that the aircraft was "leased and operated by a Texas resident" who owned and operated a business in Texas, that "[t]he crash and [the Shaiks'] damages occurred in Texas," and that Rotax "is a global company." *Id.* at 313, 317. The opinion asserted an intent to follow this Court's decisions in *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399 (Tex. 2023), and *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1 (Tex. 2021), as well as the U.S. Supreme Court's decision in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 141 S.Ct. 1017, 209 L.Ed.2d 225 (2021). *See* 698 S.W.3d at 317–18. In doing so, the court of appeals concluded that Rotax "served a market in Texas for the very engine that [the Shaiks] alleged malfunctioned and caused them injury in this state" and "that exercising jurisdiction over [Rotax] would not offend traditional notions of fair play and substantial justice," meaning that the exercise of specific personal jurisdiction over Rotax was proper. *Id.* at 309, 317.

**\*3** Rotax filed a petition for review, which we granted.

## II

**[1]** **[2]** A defendant's amenability to specific personal jurisdiction in Texas presents a question of law that we review de novo. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). Where the "relevant facts" are undisputed, "we consider only the legal question [of] whether [those] facts establish Texas jurisdiction." *Id.*

**[3]** **[4]** Our analysis begins with some familiar boilerplate. "A court must have personal jurisdiction over a defendant to issue a binding judgment." *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023). Texas courts, specifically, exercise personal jurisdiction over litigants by reference to the Texas long-arm statute and federal constitutional due-process guarantees. *See id.*; *see also Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013) (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007)). While "[a]llegations that a tort was committed in Texas satisfy our long-arm statute," those allegations "must also satisfy due-process requirements." *Luciano*, 625 S.W.3d

at 8 (first citing *Moncrief Oil*, 414 S.W.3d at 149; and then citing *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010)).

Adhering to the U.S. Supreme Court's precedents, our primary concern in personal-jurisdiction cases is "the constitutional right to due process." *LG Chem*, 670 S.W.3d at 346 (citing U.S. Const. amend. XIV, § 1); *cf. Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). Rotax has not invoked the Texas Constitution's due-course clause, *see* Tex. Const. art. I, § 19, so our analysis concerns only the limits imposed by federal constitutional law. We walk the path initially charted by *International Shoe Co. v. Washington*, in which the U.S. Supreme Court held that the exercise of personal jurisdiction is proper where the nonresident defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit" against it "does not offend 'traditional notions of fair play and substantial justice.' " 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

**[5]** **[6]** **[7]** There are "two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford*, 592 U.S. at 358, 141 S.Ct. 1017. The Shaiks contend only that Texas courts may exercise specific personal jurisdiction, which "covers defendants less intimately connected with a State, but only as to a narrower class of claims" than general jurisdiction would allow. *Id.* at 359, 141 S.Ct. 1017. For Texas courts to do so here, the evidence must satisfy a well-established two-prong test. *See LG Chem*, 670 S.W.3d at 347. First, Rotax must have taken "some act by which [it] purposefully avail[ed] itself of the privilege of conducting activities within [Texas], thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Second, the claims must "arise out of or relate to" Rotax's Texas-focused activities. *Ford*, 592 U.S. at 359, 141 S.Ct. 1017 (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 262, 137 S.Ct. 1773, 198 L.Ed.2d 395 (2017)).

**\*4** **[8]** **[9]** As for the first prong, we have adhered to the U.S. Supreme Court's reiterated teaching that the jurisdictionally relevant activities must have been the defendant's "own choice and not 'random, isolated, or fortuitous.' " *Id.* (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). This "deliberat[e]" conduct may come in the form of "exploiting

a market" in Texas. *See id.* (alteration incorporated) (quoting *Walden v. Fiore*, 571 U.S. 277, 285, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014)). But these activities, "whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the [nonresident] defendant could reasonably anticipate being called into a Texas court" with respect to a particular claim. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 580, 62 L.Ed.2d 490 (1980)).

**[10]** The Shaiks rely on one particular way of establishing purposeful availment: the so-called "stream-of-commerce-plus" test, first articulated in Justice O'Connor's plurality opinion in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 105, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Of course, no specific personal jurisdiction "exists over a [foreign] manufacturer whose product just happens to end up in the forum state" via the stream of commerce. *Spir Star*, 310 S.W.3d at 876. However, we have found that in certain product-liability cases, plaintiffs may leverage the stream-of-commerce-plus test "to conceptualize [the manufacturer's] minimum contacts" with Texas. *Luciano*, 625 S.W.3d at 9. Indeed, the very point of the stream-of-commerce-plus test is that Rotax's "act of placing a product into the stream of commerce does not establish purposeful availment *unless* there is 'additional conduct' evincing 'an intent or purpose to serve the market in [Texas].' " *LG Chem*, 670 S.W.3d at 347 (emphasis added) (quoting *Moki Mac*, 221 S.W.3d at 577).

Over the years, we have identified a few examples of such "additional conduct" sufficient to establish that a nonresident defendant has purposefully availed itself of the privilege of conducting business activities in Texas, including "[a]dvertising in telephone directories in Texas cities" and "operating an office for sales information and support." *See, e.g., Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) (first citing *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 436 (Tex. 1982); and then citing *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 201 (Tex. 1985)). Additionally, and as relevant here, the stream-of-commerce-plus test finds purposeful availment where the nonresident defendant "creat[es], control[s], or employ[s] the distribution system that brought the product into [Texas]." *Luciano*, 625 S.W.3d at 10 (citing *CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996)). But all the while, and consistent with U.S. Supreme Court precedent, we have emphasized that the defendant's "*awareness* that the stream

of commerce may or will sweep the product into [Texas] does not convert the mere act of placing the product into the stream into an act purposefully directed toward [Texas]." *CSR*, 925 S.W.2d at 595 (emphasis added) (quoting *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026 (plurality opinion)).

**[11]** **[12]** Thus, a key point is that mere awareness, or "foreseeability," of a product's sale or distribution in Texas "alone" cannot "create minimum contacts" sufficient to "support personal jurisdiction." *Id.* at 595–96. In *TV Azteca v. Ruiz*, we summarized a host of our cases, which in turn applied recent decisions of the U.S. Supreme Court, as follows:

> [A] nonresident who places products into the "stream of commerce" with the expectation that they will be sold in the forum state may be subject to personal jurisdiction in the forum. *But even under that theory*, mere knowledge that the product will be sold in the forum state is not enough. A product seller's awareness that the stream of commerce *may or will sweep the product into the forum State* does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State. Instead, *additional conduct must demonstrate an intent or purpose to serve the market* in the forum State.

**\*5** 490 S.W.3d 29, 46 (Tex. 2016) (emphasis added) (internal quotation marks and citations omitted). For that reason, stream-of-commerce-plus jurisdiction attaches "only when the defendant *targets* the forum, not when the defendant merely *foresees* his product ending up there." *Luciano*, 625 S.W.3d at 13 (emphasis added). Relevant "additional conduct," in other words, must show "targeting" Texas in particular, not merely passive awareness of a likelihood—even a substantial likelihood verging on certainty—that products may eventually arrive in our State.

**A**

**[13]** The Shaiks allege that any one of four pieces of evidence demonstrates sufficient "additional conduct" to establish that Rotax purposefully availed itself of Texas. First, the Shaiks claim that the distribution agreement between Rotax and Kodiak shows that Rotax "creat[ed], employ[ed], and control[led] a network of authorized distributors and servicers to sell and service ... Rotax aircraft engines in Texas." That "service and distribution network," they say, was obligated to "market[ ] and advertis[e]" Rotax engines and replacement parts in Texas and at Rotax's direction. Second, the Shaiks assert that Rotax "specifically authorized" the repair center in Bulverde, Texas, known as "Texas Rotax," through which Rotax "servic[ed], repair[ed], and warrant[ied] hundreds of Rotax ... engines in Texas." Third, the Shaiks argue that Rotax, through its website, "interact[ed] directly with Texans." And finally, they point to the number of Rotax engines registered here between 2016 and 2020—roughly 150 —which, they say, shows that Rotax "sen[t] hundreds of ... engines into Texas through its distributorship network."

We conclude that this evidence, whether taken individually or collectively, does not satisfy the requirements of the stream-of-commerce-plus test. Examining the Shaiks' four contentions shows why.

*First*, Rotax's "network of authorized distributors" or "service and distribution network" turns out to consist of just one relevant distributor: Kodiak. Kodiak, however, is indisputably an independent, Bahamian company in which Rotax holds no ownership interest. Importantly, *Rotax* has no distributors in Texas or even the United States. Instead, for its products to reach the aircraft-engine market for nearly half the globe, Rotax contracted with Kodiak pursuant to a distribution agreement. The agreement authorized Kodiak to sell Rotax products in what the agreement defined as Kodiak's "TERRITORY"—namely, the United States, Central America, and most of South America, collectively constituting nearly the entire Western Hemisphere.

In its territory, Kodiak sells engines that it has purchased from Rotax through Kodiak's distribution centers in Florida, Wisconsin, and California. For example, Kodiak sold the allegedly defective engine that injured the Shaiks to Lockwood Aviation, which is Kodiak's sub-distributor in Florida. Kodiak, like Rotax, has no distributors or sub-distributors in Texas.

We find it telling, therefore, that to establish even an arguable basis for exercising jurisdiction over Rotax, the Shaiks continually treat Rotax and Kodiak as one and the same— often saying that "Rotax" *itself* "servic[ed]," "repair[ed]," "market[ed]," or "advertis[ed]" its engines outside Austria, where *only* Kodiak or its sub-distributors and dealers conducted those activities. Rotax and Kodiak, however, are not the same in any sense. The law provides ways to prove that Rotax either is in fact Kodiak or that Rotax so thoroughly controls Kodiak that it is justifiable to treat them as the same. But the Shaiks have made no such effort here, and the record in no way suggests that such an effort could succeed.

**\*6** **[14]** Verbs imputing *Kodiak's* actions to *Rotax*, therefore, cannot advance the Shaiks' effort, for "it is only the *defendant's* contacts with the forum that count." *Michiana*, 168 S.W.3d at 785 (emphasis added). Take, for example, the Shaiks' allegation that Rotax "sen[t] hundreds" of engines to Texas "through its distributorship network." That allegation is doubly imprecise: the Shaiks not only present no evidence that Rotax itself ever sent anything to Texas, but also improperly neglect Rotax's and Kodiak's status as "distinct corporate entities." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002). They have not argued that Kodiak is Rotax's agent, much less its alter ego. Indeed, we reject such an effort even for "parent" and "subsidiary" companies, so we are far less willing to do so for those that are unrelated. *See id.* at 799 ("To 'fuse' the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary.").

**[15]** **[16]** Of course, Kodiak's independent status is not, by itself, a categorical basis for rejecting a jurisdictional allegation against Rotax. After all, "purposeful availment of local markets may be either direct (through one's own offices and employees) or indirect (through affiliates *or independent distributors*)." *Spir Star*, 310 S.W.3d at 874 (emphasis added). So "[w]hen an out-of-state manufacturer ... specifically targets Texas as a market for its products, that manufacturer is subject to a product liability suit in Texas based on a product sold here, even if the sales are conducted through a Texas distributor or affiliate." *Id.* But again, "it is not the actions of the Texas intermediary that count, but the actions of the foreign manufacturer who markets and distributes the product to profit from the Texas economy." *Id.* Said differently, what matters is that Rotax must "specifically target[ ] Texas." *Id.* If a nonresident targets Texas by deploying others to achieve the goal, the outcome for purposes of personal jurisdiction is no different than if the nonresident targeted Texas directly.

There is no Texas "distributor," "affiliate," or "intermediary" here, but we have recognized that "a truly interstate business may not shield itself from suit by a careful, but formalistic structuring of its business dealings." *Siskind*, 642 S.W.2d at 437 (quoting *Vencedor Mfg. Co. v. Gougler Indus., Inc.*, 557 F.2d 886, 891 (1st Cir. 1977)). In *Siskind*, we observed that the nonresident defendant "affirmatively s[ought] business in Texas" through its "advertising activities" and "practice of mailing informational packets," "applications," "invitations," and "contracts to Texas residents." *Id.* at 436. In concluding that the defendant purposefully availed itself of Texas, we said that it was "not determinative" that the defendant "accepted the contract and was to perform its obligations" in another state. *Id.* at 437. Indeed, that sort of "formalistic structuring" of business dealings did not allow the defendant to escape jurisdiction in Texas where its "purposeful act[s]" were otherwise sufficient. *See id.* at 436–37.

We therefore look to the distribution agreement between Rotax and Kodiak. What we find is nothing "formalistic" in the sense that *Siskind* used that term—that is, targeting Texas yet hoping to obscure that effort, such as by explicitly structuring its transactions with Texans to take place outside Texas while directly marketing those transactions inside Texas to Texans. The Shaiks allege that Rotax marketed and advertised its engines in Texas through its service and distribution network. But the distribution agreement makes *Kodiak* responsible for advertising in Kodiak's "TERRITORY"—which of course includes Texas—but mandates no particular location within that vast territory. It provides, for example, that Kodiak

> shall ensure that it and [its] dealers advertise, display, and demonstrate [Rotax's product] ... in TERRITORY, and shall encourage and assist the dealers to advertise, display, demonstrate, and sell said PRODUCT to the public ... at suitable locations and with adequate facilities.

**\*7** It is hardly "formalistic" to recognize that unlike the transactions in cases like *Spir Star* and *Siskind*, nothing in the agreement here specifically targets or "directs marketing efforts to Texas." *Cf. Michiana*, 168 S.W.3d at 785 (observing that "a nonresident that *directs* marketing efforts *to Texas* in the hope of soliciting sales is subject to suit here in disputes

arising from that business" (emphasis added)). The agreement expresses no view, much less any command, about whether any business at all will be transacted in Texas—it simply requires Kodiak to deliver results within a territory spanning two continents. If this were enough to constitute purposeful availment, then the stream-of-commerce-plus test would come to an end. Our unwillingness to disregard "formalistic structuring" would be transformed into the elimination of any requirement to identify conduct that actually targets Texas. Instead, we adhere to our precedents: *Targeting Texas* remains the touchstone. We will not overlook such targeting when it is wrapped up in various business arrangements, but neither will we find targeting that does not exist merely because a product ultimately comes to Texas.

**[17]** **[18]** True, the distribution agreement states that Rotax must provide "specific written permission" before Kodiak can use the Rotax name, "trademark," or "trade name." This general requirement has nothing to do with targeting any particular market, and that minuscule measure of control is in any event jurisdictionally unremarkable given that "a trademark owner has a duty to exercise control and supervision over [a] licensee's use of the mark." *E.g., Ron Matusalem & Matusa of Fla., Inc. v. Ron Matusalem, Inc.*, 872 F.2d 1547, 1551 (11th Cir. 1989) (citing *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124 (5th Cir. 1973)). We refuse to put nonresident defendants to such a choice: do not defend your marks (despite the law's requirements) *or* submit to our jurisdiction for doing so. Most importantly, as the distribution agreement shows, Rotax expressed no view about *where* Kodiak used its advertisements and did not control the frequency or method by which Kodiak did so.

**[19]** *Second*, the Shaiks rely heavily on the mere existence of "Texas Rotax," the Bulverde-based service center, as a basis to subject Rotax to jurisdiction in Texas. But again, the distribution agreement shows that *Kodiak*, not *Rotax*, is wholly responsible for establishing Texas Rotax. It gives Kodiak the "right to establish, operate and maintain an adequate dealer organization"—"including authorized repair and service centers"—in any way that it chooses and anywhere within its territory, a space so vast that even Texas looks small. The agreement correspondingly makes Kodiak, not Rotax, responsible for "maintain[ing] and requir[ing]" Texas Rotax to have an "adequate inventory of spare parts, capable of adequately servicing" Rotax's engines, and it requires Kodiak, not Rotax, to ensure that Texas Rotax (or any such center that Kodiak creates) honors Rotax's limited warranty.

What is initially striking about each of these provisions is that none evinces an objective or purposeful intention of Rotax to do *anything* in Texas. Rather, these provisions relate to *Kodiak's* obligations in its territory, which simply includes Texas. Rotax never directed Kodiak to establish Texas Rotax specifically or to establish any center within Texas at all —Kodiak did so of its own accord with Rotax's general permission. Kodiak, not Rotax, was responsible for training at Texas Rotax; Kodiak, not Rotax, reimbursed Texas Rotax for any warranty work that it did; and Kodiak, not the end-user or even Texas Rotax, would later be reimbursed directly by Rotax for the warranty claim. Simply put, there is no evidence that Rotax had any interest in any entity being in Bulverde or anywhere else in Texas as opposed to any other place within Kodiak's territory.

 **[20]**   *Third*, the Shaiks are surely correct that Texans may have interacted with Rotax's website, but they have not identified anything about the website that targets Texas or Texans. Instead, they repeatedly emphasize that the website and especially the engine manual downloaded from the website were written in English as supporting Rotax's attempt to avail itself of Texas. This argument lacks merit. If any website's mere use of English illustrates an attempt to target Texas specifically—as opposed to the other jurisdictions within our nation and across the world that primarily speak English—then the work of the Texas courts should be expected to grow by massive proportions. Notably, the use of English in a website and manual about *airplane engines* is not limited even to the English-speaking world. For example, the International Civil Aviation Organization introduced language to "ensure that air traffic personnel and pilots are proficient in the English language." *See A38-8: Proficiency in the English Language Used for Radiotelephony Communications*, Int'l Civ. Aviation Org., https://www.icao.int/safety/lpr/Documents/A38.8.pdf. This recognition of English as the international language of aviation is not unique. *E.g., Paul v. Petroleum Equip. Tools Co.*, 708 F.2d 168, 172 (5th Cir. 1983) (noting the "threshold requirements for a commercial pilot certificate include proof that the applicant ... is able to read, speak, and understand English").

 **\*8**   Contrary to the Shaiks' argument that the website is "interactive" in a legally significant way, moreover, it is undisputed that Rotax engines cannot be purchased off the Rotax website. *See McFadin v. Gerber*, 587 F.3d 753, 762 (5th Cir. 2009) (concluding that "the website was passive," not "active," because it "provid[ed] no means for orders"). Prospective or current customers in the market for a Rotax engine could perhaps email Rotax through the website's home page, and it may be true that the allegedly defective engine here was inspected and installed using a Rotax engine manual downloaded from the website by someone in Texas. None of that moves the needle toward subjecting Rotax to jurisdiction. Those actions could have been taken by anyone from anywhere on Earth, but "[t]he unilateral activity of another party or a third person is *not an appropriate consideration* when determining whether a defendant has sufficient contacts" for specific personal jurisdiction. *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 417, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (emphasis added).

 **[21]**   *Finally*, and for the same reason, we reject the Shaiks' attempt to hale Rotax into Texas given the "hundreds" of engines that third parties have voluntarily registered as located in Texas. Such actions are even more attenuated and beyond Rotax's control than the commercial transactions that we have already described. We also cannot agree that the presence of these engines demonstrates any "profit" to Rotax, especially where the Shaiks have offered no evidence of any sales of Rotax engines by anyone to anyone in Texas beyond the single engine at issue in this case.

## B

The Shaiks contend that the court of appeals' judgment "involved nothing more than a straightforward application of settled law." But for reasons that should now be apparent, "[e]xercising jurisdiction here would go far beyond anything we have approved in other commercial cases." *Michiana*, 168 S.W.3d at 786. The court of appeals principally relied on three cases: *Volkswagen, Luciano*, and *Ford.* 698 S.W.3d at 317–18. Its holding in this case pushes far beyond the boundaries of each of those cases.

In *Volkswagen*, this Court stressed the "control" of the German manufacturers in concluding that they were subject to specific personal jurisdiction in an enforcement suit brought by the State. 669 S.W.3d at 415 (noting how the manufacturers put actionable conduct "into unstoppable motion," which "did not derive from unilateral or independent action of [the distributor]"). *Volkswagen* was not even a "stream of commerce" case, nor does it have much utility here, where no sovereign is prosecuting any case against

Rotax for purposefully violating Texas law inside Texas. *See id.* at 415, 417. The Court observed that a nonresident "defendant need not single Texas out in some unique way to satisfy constitutional dictates," but that was because "direct[ing] activity to *every* state" is no less a targeting of Texas as to whatever activity occurred within Texas. *Id.* at 420. The distribution agreement between Rotax and Kodiak does not resemble the control the German manufacturers exercised there, which amounted to directly and purposefully affecting cars already in Texas, and indeed there is no evidence that Rotax specifically targeted Texas *at all. See id.* at 415, 417, 420.

In *Luciano*, we emphasized the manufacturer's "purposeful acquisition of ... warehouse space in Texas" where it (not someone else) "maintain[ed] a stock of merchandise," as well as its (not someone else's) retention of a "local sales representative" to "find customers" specifically in Texas. 625 S.W.3d at 11, 17 (stressing how all this was at the defendant manufacturer's own "direction and on [its own] dime"). Rotax did *none* of these things itself and certainly not on *its* "dime." *Luciano* is, in essence, like *Spir Star* and *Siskind*. The touchstone remains directly targeting Texas. We will not overlook it when it occurs, as it decidedly did there.

**\*9** And in *Ford*, the manufacturer admitted that it had "substantial business [in the forum States]" and "actively s[ought] to serve the market for automobiles and related products in those States." 592 U.S. at 361, 141 S.Ct. 1017 (taking this as an admission that Ford "purposefully availed itself of the privilege of conducting activities" in the forum states (alteration incorporated)). Indeed, even if we considered Texas Rotax as a *Rotax* contact with Texas, which for the reasons discussed above we do not, that single contact would be miles away from Ford's pervasive presence through dealerships and service centers spread across the forum states. *See id.* Unlike the evidence in *Ford*, in other words, there is no evidence that Rotax has conducted "substantial business" in Texas—let alone an admission by Rotax that it has purposefully availed itself of the privilege of doing business here. *See id.*

\* \* \*

To summarize, Rotax is not Kodiak. Kodiak advertises, at its own discretion, within its territory and provides after-sale support for Rotax products. Nothing requires Kodiak to advertise in Texas as opposed to elsewhere in the Western Hemisphere. Kodiak—not Rotax—works with sub-distributors and service centers like Texas Rotax throughout its territory. And Kodiak alone is responsible for further distributing Rotax's products and establishing service networks, according to whatever plan Kodiak deems best —including Texas or excluding it. So long as Kodiak is successful within its broad territory, Rotax is apparently happy—even if every engine Kodiak sold went to Brazil, Panama, or South Dakota.

**[22]** We said, and now say again, that "stream-of-commerce jurisdiction requires a stream, not a dribble." *Michiana*, 168 S.W.3d at 786. All the evidence in this case demonstrates that Rotax's engine came to Texas by the unilateral actions of third parties—and certainly not from any "stream" engineered, controlled, or manipulated by Rotax. Here, the plaintiffs have not offered any evidence that Rotax—or its distributor Kodiak, or even a Kodiak sub-distributor—was routinely sending Rotax engines into Texas, let alone selling them to Texans. Instead, the evidence shows that (1) Rotax had one relevant distributor, Kodiak; (2) Kodiak had substantial discretion in marketing and advertising Rotax products; (3) engines were voluntarily registered in Texas but were not delivered there; (4) Kodiak was responsible for warranty claims and establishing Texas Rotax; and (5) the Rotax website was not interactive or targeted toward Texans.

**[23]** We do not retreat from our observation in *Luciano* that, "[u]ndoubtedly, a nonresident defendant may 'purposefully avoid' a particular jurisdiction 'by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction.' " 625 S.W.3d at 9 (citation omitted). We find ourselves with such a case today and so are breaking no new ground in our holding. Indeed, we decline to give even the slightest credence to the arguments that Rotax must have treated Texas the same way it does Iraq, Iran, and North Korea to avoid personal jurisdiction here. Rotax's instruction to its distributors not to ship its engines to these countries— countries notably targeted by international sanctions—hardly means that Rotax has, by default, purposefully availed itself of *every other forum* for which it did not give that instruction.

The evidence is legally insufficient to show that Rotax "has 'continuously and deliberately exploited [Texas's] market' " such that it can " 'reasonably anticipate being haled into [Texas] courts' to defend actions 'based on' products causing injury there." *Cf. Ford*, 592 U.S. at 364, 141 S.Ct. 1017 (alteration incorporated) (quoting *Keeton*, 465 U.S. at 781, 104 S.Ct. 1473). Rotax contracted with a distributor that in turn had wide discretion in building a "distribution system

that [ultimately] brought" the Rotax engine to Texas. *Cf. Asahi*, 480 U.S. at 112, 107 S.Ct. 1026 (plurality opinion). But that is legally distinct from "creat[ing], control[ling], or employ[ing] the distribution system that brought [the product] to [Texas]." *See id.* In the end, Rotax's supposed "contacts with Texas"—*i.e.*, the mere fact that its engine allegedly failed in Texas and injured Texas residents—"were ... fortuitous or accomplished by the unilateral actions of third parties," *cf. Volkswagen*, 669 S.W.3d at 406, meaning it did not purposefully avail itself of the privilege of doing business here.

**\*10** Without purposeful availment, there can be no specific personal jurisdiction over Rotax. *Cf. Luciano*, 625 S.W.3d at 13. Without any "Texas activities," *see id.* at 16, we cannot proceed any further in the specific-personal-jurisdiction analysis.

### III

All told, this case is not among those "narrower class of claims" where specific personal jurisdiction is proper. *See Ford*, 592 U.S. at 352, 141 S.Ct. 1017. We reverse the judgment of the court of appeals and render judgment dismissing the case against Rotax.

Justice Busby filed a concurring opinion, in which Justice Devine joined.

Justice Busby, joined by Justice Devine, concurring.
I join the Court's opinion, which faithfully applies the law of personal jurisdiction to the facts of this case. But I do so with growing concern about the Supreme Court of the United States' decision to enshrine "fair play" and "reasonableness" as the constitutionally mandated touchstones of personal jurisdiction. These squishy, subjective standards—unmoored from constitutional text and history—have failed on their own terms, producing inconsistent, unpredictable, and thus *un*fair results in factually similar cases brought in different courts. Indeed, this very case would have been decided differently had it been filed in a Texas *federal* court. Jurists, scholars, and commentators have all written extensively on the problem, but nothing has changed: my colleagues and I must still apply this broken regime ushered in by *International Shoe Co. v. Washington* nearly 80 years ago. [1]

As explained below, the doctrine is unworkable: it yields mixed results in indistinguishable cases, allowing one court to assert personal jurisdiction where another will not. Even worse, the current regime makes it easier for Texas federal courts to exercise personal jurisdiction over nonresident corporate defendants—via the so-called "pure" stream-of-commerce test—than for Texas state courts—which apply the more stringent stream-of-commerce-plus test. All this uncertainty is costly for parties and inefficient for courts.

These difficulties in applying *International Shoe* consistently are the unsurprising result of the Supreme Court's decision to deviate from a deeply rooted historical understanding of courts' power over parties—their jurisdiction to adjudicate. But the tide is shifting: recent scholarship has helped recover the original practice of American courts regarding personal jurisdiction. This practice shows that *International Shoe* went beyond what the Constitution requires: it constitutionalized personal jurisdiction under the banner of "due process" even though that concept alone offers no judicially discoverable or manageable standards for determining jurisdiction. Because this error still haunts courts and litigants today and results in federal-versus-state forum splits like the one here, I write separately to urge the Supreme Court to reconsider its approach to personal jurisdiction.

### I

**\*11** I begin by explaining the Court's current fairness-based approach to constitutional personal jurisdiction and showing that it yields inconsistent and unpredictable results that are unfair on their own terms. This case provides a typical illustration of these problems.

### A

Since *International Shoe*, the Supreme Court of the United States has focused its approach to personal jurisdiction mostly on one guidepost: "general fairness." *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952). [2] In *World-Wide Volkswagen Corp. v. Woodson*, the Court explained its view of the Due Process Clause as a "guarantor against inconvenient litigation," observing that this "protection ... is typically described in terms of 'reasonableness' or 'fairness.' " 444 U.S. 286, 292, 100 S.Ct. 580, 62 L.Ed.2d 490 (1980). Over the decades, many justices writing separately have agreed with this description: the

inquiry turns on "fairness" to the defendant.[3] Equally clear "is what does *not* drive [this analysis]: original meaning."[4]

In assessing "fairness," *International Shoe* and its progeny instruct courts to apply a basic rule taught in 1L Civil Procedure courses across the Nation: "due process requires" that a defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." 326 U.S. at 316, 66 S.Ct. 154 (internal quotation marks omitted). Put slightly differently, there must be "such contacts ... with the state of the forum as make it reasonable, in the context of our federal system of government, to require [a defendant] to defend a particular suit which is brought there." *Id.* at 317, 66 S.Ct. 154; *see also id.* (considering whether defense would "lay too great and unreasonable a burden on the [defendant] to comport with due process").

**\*12** "[O]bvious and necessary though the principle may [have] be[en], it is an abstraction without easy application." *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 680 (Tex. 2006). As nearly 80 years of trying to break in *International Shoe* have revealed, its fairness-based approach to personal jurisdiction fails on its own terms. Scholarly criticism of the doctrine's shortcomings in the modern world and empirical data from judicial decisions agree: using subjective concepts of fairness, reasonableness, and justice to measure personal jurisdiction simply does not work.

In *World-Wide Volkswagen*, the Court stated the doctrine's objective: "[t]he Due Process Clause, by ensuring the orderly administration of the laws, gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." 444 U.S. at 297, 100 S.Ct. 580 (quoting *Int'l Shoe*, 326 U.S. at 319, 66 S.Ct. 154). A few decades later, the Court reiterated that having "[s]imple jurisdictional rules ... promote[s] greater predictability"; it "is valuable to corporations making business and investment decisions" and "also benefits plaintiffs deciding whether to file suit in a state or federal court." *Hertz Corp. v. Friend*, 559 U.S. 77, 94, 95, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010).

Unfortunately, the Supreme Court's current fairness-based approach is the opposite of consistent, predictable, and orderly. Legal scholars have recognized for decades that *International Shoe* means "too many things to too many people,"[5] yielding a body of cases that is "plagued" by "[a]mbiguity and incoherence."[6] This personal-jurisdiction regime breeds inconsistency in the law, leaving litigants guessing what contacts amount to "minimum contacts" and courts unsure whether their exercise of jurisdiction comports with "fair play and substantial justice."[7] Such uncertainty increases litigation costs, incentivizes forum shopping,[8] and consumes more of our scarce judicial resources.

**\*13** Extensive scholarly research shows that this doctrine has produced confusion among state and federal courts nationwide[9]—nowhere more pervasively, perhaps, than where jurisdiction is predicated on a nonresident defendant's "contacts" with a forum through the internet.[10] Different States' courts are divided on the correct standard to apply in deciding whether a corporate defendant has "minimum contacts" with the forum,[11] as are federal circuit courts across the Nation.[12] Even more troubling, state courts and the federal circuits that include those States have split on what standard to apply, as this case shows.[13]

The Supreme Court not only has allowed these conflicts to persist, it has also facilitated their growth by producing a string of plurality and closely divided decisions.[14] Even in *Ford Motor Co. v. Montana Eighth Judicial District Court* (one of the Court's recent attempts at untangling the doctrine) there was fair-minded disagreement on what the majority's opinion meant.[15] "It is a perilous project [for lower courts] to interpret a Supreme Court [doctrine] that *the Justices themselves* interpret differently." *Ethridge v. Samsung SDI Co.*, 137 F.4th 309, 317 (5th Cir. 2025) (Oldham, J.).

**\*14** These signals all point in the same direction: courts are doing their level best to apply a flawed doctrine. And "[t]he impact of these differing approaches is clear: disharmony and unpredictability."[16] The Court's approach to personal jurisdiction should be "rooted in part in a realization that it would be unfair for the character or result of a litigation materially to differ because the suit had been brought in a federal court." *Hanna v. Plumer*, 380 U.S. 460, 467, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). But the current doctrine does no such thing: far from "discourag[ing] ... forum-shopping," *id.* at 468, 85 S.Ct. 1136, it instead "render[s] impossible [the] equal protection of the law," *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 75, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).[17]

**B**

I can think of no better illustration of the problem than the aspect of personal jurisdiction at issue here: the stream-of-commerce doctrine. Our journey through this doctrinal labyrinth begins with the Supreme Court's decision in *World-Wide Volkswagen.* After purchasing a car in New York, the Robinsons embarked on a cross-country trip to their new Arizona home. While passing through Oklahoma, they were involved in an accident. The Robinsons sued (among others) the car's regional distributor, World-Wide, and its New York retailer in Oklahoma state court, alleging various products-liability claims. Contrary to its name, World-Wide contended that exercising jurisdiction over it would violate due process, but the Oklahoma courts disagreed. The U.S. Supreme Court reversed. Considering "the apparent paucity of contacts between [World-Wide] and Oklahoma," 444 U.S. at 289, 100 S.Ct. 580, the Court held that Oklahoma's exercise of jurisdiction would offend principles of "reasonableness or fairness," *id.* at 292, 100 S.Ct. 580, as World-Wide did not "deliver[ ] its products into the stream of commerce with the expectation that they [would] be purchased by consumers in the forum State," *id.* at 298, 100 S.Ct. 580.

Not even a decade later, the Court was presented with another opportunity to address the stream-of-commerce theory in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion). After an allegedly defective tire caused a fatal car collision, the plaintiffs sued a Taiwanese manufacturer that filed a cross-complaint against Asahi, a Japanese corporation. Asahi's contacts with the United States were limited: its manufacturing occurred in Japan and its products' arrivals here were indirect, occurring mostly through the Taiwanese manufacturer's sales. Even if it did not directly target the United States, testimony showed Asahi knew very well that its products would end up here. The Court granted certiorari to decide

> whether the mere awareness on the part of a foreign defendant that the components it manufactured, sold, and delivered outside the United States would reach the forum State in the stream of commerce constitutes "minimum contacts" between the defendant and the forum State such that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.' "

**\*15** *Id.* at 105, 107 S.Ct. 1026 (quoting *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154).

Writing for a plurality, Justice O'Connor answered "no": mere awareness could not serve as a basis for jurisdiction unless some further action was taken—the minimum contacts "must come about by *an action of the defendant purposefully directed toward the forum State.*" *Id.* at 112, 107 S.Ct. 1026. "The placement of a product into the stream of commerce, without more," the plurality held, is not such a purposefully directed act; "[a]dditional conduct" indicating an intent or purpose to serve the market is required. *Id.*

Justice Brennan concurred in the judgment, disagreeing with the plurality's reasoning and seeing no need for a showing of "additional conduct" indicating an intent or purpose to serve the forum. *Id.* at 117, 107 S.Ct. 1026 (Brennan, J., concurring). Instead, he viewed the stream of commerce as referring not "to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Id.* [18]

Since *Asahi*, "[t]he rules and standards for determining when a State does or does not have jurisdiction over an absent party have been unclear." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 877, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011) (plurality opinion). Lower "courts have sought to reconcile the competing opinions," *id.* at 883, 131 S.Ct. 2780, and so has the Supreme Court. Just over a decade ago in *Nicastro*, for example, the Court again tried to offer guidance on which approach—Justice O'Connor's or Justice Brennan's —better applied to the "decades-old questions left open in *Asahi.*" *Id.* at 877, 131 S.Ct. 2780. But to no avail—again, a plurality agreed with Justice O'Connor's "plus" approach, *id.* at 883, 131 S.Ct. 2780, while their colleagues preferred Justice Brennan's approach, *id.* at 903-05, 131 S.Ct. 2780 (Ginsburg, J., dissenting). Several scholars have criticized the split of authority. [19] And various courts attempting to apply the governing stream-of-commerce doctrine have reached opposite holdings in different jurisdictions on similar facts. [20]

**\*16** We are left today with just as many questions as before. Courts across the Nation have chosen inconsistent approaches to this stream-of-commerce conundrum: some apply a "pure" standard based on foreseeability while others require a "plus." Nowhere is this inconsistency more vividly on display than in the approach taken and reasoning used in Texas federal and state courts.

The U.S. Court of Appeals for the Fifth Circuit follows the "stream-of-commerce" approach to personal jurisdiction, "under which the minimum contacts requirement is met so long as the court 'finds that the defendant delivered the product into the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state.' " *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013) (quoting *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987)). In applying that test, "mere foreseeability or awareness is a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce." *Luv n' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006) (cleaned up). But "the defendant's contacts must be more than 'random, fortuitous, or attenuated, or ... the unilateral activity of another party or third person.' " *Ainsworth*, 716 F.3d at 177 (internal citation omitted); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Texas federal district courts have attempted to follow this approach faithfully. [21]

This Court, on the other hand, has adopted the *Asahi* plurality's approach, endorsing the so-called stream-of-commerce-plus test. [22] *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010) ("[O]ur precedent generally follows Justice O'Connor's plurality opinion in *Asahi*, which requires some 'additional conduct'—beyond merely placing the product in the stream of commerce—that indicates 'an intent or purpose to serve the market in the forum State.' "); *see also In re Christianson Air Conditioning & Plumbing, LLC*, 639 S.W.3d 671, 677 (Tex. 2022). Our courts of appeals have attempted to apply this theory faithfully, [23] and this Court applies it faithfully today. *Ante* at —— – ——.

 **\*17**  Given this division between Texas state and federal courts, whether a court in Texas has personal jurisdiction over Rotax depends on where the case is filed: state court or federal court. As the Court explains, Texas state courts cannot exercise personal jurisdiction over Rotax under the stream-of-commerce-plus theory. *Ante* at ——, ——.

But a Texas federal court surely could under the pure stream-of-commerce theory. Plaintiffs allege and the record confirms that Rotax, an Austrian manufacturer of airplane engines for markets worldwide, placed an allegedly defective airplane engine into the stream of commerce with the knowledge that it could reach the Texas market. Specifically, Rotax created, controlled, and employed a network of authorized independent distributors to sell its engines. It entered into a distribution agreement with Kodiak, and Texas is in the territory that the agreement requires Kodiak to serve. Hundreds of Rotax engines are registered in Texas, and the record shows that the engine at issue here traveled through the stream of commerce from Rotax to Texas through Kodiak and one of its sub-distributors. Rotax also authorized Kodiak to create centers to service, repair, and fulfill Rotax's warranty obligations on Rotax engines. Kodiak established such a center in Bulverde, Texas, and Rotax is required to reimburse Kodiak for warranty claims made through the center. Because this evidence shows Rotax "delivered [engines] into the stream of commerce with the expectation that [they] would be purchased by or used by consumers in [Texas]," a federal court in Texas would have specific personal jurisdiction over Rotax. *Bearry*, 818 F.2d at 374; *see also Luv n' care*, 438 F.3d at 470 (requiring "mere foreseeability or awareness" that product will enter forum state while in stream of commerce). Nothing in this Court's opinion today is to the contrary.

\* \* \*

If "fairness" is to be our constitutional north star in determining personal jurisdiction, as the Supreme Court has directed, this result surely shows we have been led astray. Today's holding—that the U.S. Constitution does not permit personal jurisdiction over Rotax, a holding that directly results from *International Shoe*'s fairness-based scheme—allows plaintiffs suing in Texas to invoke the jurisdiction of a federal court over a defendant when they could not do so in state court. Unless we revisit what the Constitution requires, anomalies like this one will continue confusing lower courts and litigants alike.

## II

It should come as no surprise that state and federal courts in Texas have broken from each other on the stream-of-commerce test, and that *International Shoe* has proven difficult to apply in a predictable, even-handed fashion. As many courts and scholars have explained, the existing fairness-based approach is unmoored from our Constitution's text and history. [24] In particular, nothing in the text or history of the Due Process Clause of the Fourteenth Amendment provides an objective basis for determining when an exercise of personal jurisdiction over a foreign corporate defendant would be "unfair"—for example, whether that clause requires

the stream of commerce to have a "plus." Instead, I urge the Supreme Court to consider the guidance provided by early American practice regarding personal jurisdiction, which supports a sovereignty-based approach rooted in principles of customary law governing jurisdiction to adjudicate.

**A**

**\*18** "The one thing jurisdiction scholars agree on is the sad state of personal jurisdiction law."[25] For the most part, attacks on *International Shoe* have focused on the Court's inability to speak with one voice on when a forum's exercise of jurisdiction will comport with "fair play and substantial justice."[26] Instead, the Court has offered a potpourri of "catchphrases and buzzwords"[27]—*i.e.*, "minimum contacts," "substantial justice," "fair warning," "purposeful availment," and "reasonableness"—that are detached from early American personal-jurisdiction practice. *See Burger King*, 471 U.S. at 472-78, 105 S.Ct. 2174. And it has sent conflicting signals regarding the importance of particular considerations, such as the burden on the defendant[28] and the plaintiff's interest in a convenient forum.[29] Volatility and inconsistency in providing a single, constitutionally rooted focus has left lower courts scrambling to find a true "touchstone" in this analysis. "[W]e should endeavor to make the law simpler, not more byzantine." *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 249 (5th Cir. 2022) (Ho, J., concurring).

Calls to discard *International Shoe*'s regime have also come from its creator—the Supreme Court. The first objection to a fairness-based doctrine of jurisdiction came from Justice Black in *International Shoe* itself. After a majority of the *International Shoe* Court held that "fair play," "justice," and "reasonableness" applied whenever personal jurisdiction was involved, Justice Black wrote separately to emphasize the danger *International Shoe* posed to "our federative system of government." 326 U.S. at 323, 66 S.Ct. 154 (opinion of Black, J.). *International Shoe*'s reasoning, he explained, "introduced uncertain elements confusing the simple pattern and tending to curtail the exercise of State powers to an extent not justified by the Constitution." *Id.* He saw no basis for "stretch[ing] the meaning of due process so far as to authorize this Court to deprive a State of the right to afford judicial protection to its citizens on the ground that it would be more 'convenient' for the corporation to be sued somewhere else." *Id.* at 325, 66 S.Ct. 154.

Moreover, Justice Black foresaw what *International Shoe* threatened to become:

> I believe that the Federal Constitution leaves to each State, without any 'ifs' or 'buts', a power to tax and to open the doors of its courts for its citizens to sue corporations whose agents do business in those States. Believing that the Constitution gave the States that power, I think it a judicial deprivation to condition its exercise upon *this Court's notion* of 'fairplay', however appealing that term may be.

*Id.* at 324-25, 66 S.Ct. 154 (emphasis added). He explained that a test focused on "reasonableness, justice, or fair play, makes judges the supreme arbiters of the country's laws and practices," while the Constitution and our oath to preserve it require a less judge-centric approach. *Id.* at 326, 66 S.Ct. 154.[30] As Justice Black's prophecy has come true, more judges are questioning whether *International Shoe* and its progeny should be revisited.

**\*19** Just a few Terms ago, for example, Justice Gorsuch expressed his skepticism about the Court's "personal jurisdiction jurisprudence and *International Shoe*'s increasingly doubtful dichotomy." *Ford Motor*, 592 U.S. at 384, 141 S.Ct. 1017 (Gorsuch, J., concurring). After a majority of the Court added another chapter to the already confusing *International Shoe* saga, Justice Gorsuch took the occasion to explain why another chapter had become necessary: "because the old [*International Shoe*] test no longer seems as reliable a proxy for determining corporate presence as it once did." *Id.* at 382-83, 141 S.Ct. 1017. *International Shoe* offered "a heady promise," but all the Court has done since, Justice Gorsuch explained, "is struggle for new words to express the old ideas." *Id.* Instead, Justice Gorsuch suggested that the Court should "seek to answer the right question—what the Constitution as originally understood requires, not what nine judges consider 'fair' and 'just.'" *Id.* at 379, 141 S.Ct. 1017 n.2.

Implicit in Justice Gorsuch's criticism is the reality that *International Shoe*'s attempt to "modernize" the doctrine of personal jurisdiction in response "to the fundamental

transformation of our national economy" has not worked as expected. *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). Shortly after *International Shoe*, the Court explained that "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *Id.* at 223, 78 S.Ct. 199. [31] And that burden has only continued to decrease, [32] especially for larger corporations. [33] Yet many corporations doing business nationwide have sensibly structured their affairs to minimize jurisdiction under *International Shoe* [34]—consenting to all-purpose jurisdiction in their "home" state, *see Daimler AG v. Bauman*, 571 U.S. 117, 127, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014), while limiting their exposure to personal jurisdiction in other States under the fairness-based minimum-contacts rubric. [35] Small businesses are less likely to be able to afford such structuring, yet it is they who face a greater burden when called upon to defend themselves in remote States. [36]

 **\*20** Another oddity of *International Shoe* is that foreign corporations like Rotax receive more protection under the Due Process Clause than foreign individuals, and more protection than under other provisions of the Constitution. The U.S. Supreme Court has been abundantly clear: "it is long settled as a matter of American constitutional law that foreign citizens outside U. S. territory do not possess rights under the U. S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433, 140 S.Ct. 2082, 207 L.Ed.2d 654 (2020). This principle includes foreign corporations: "foreign organizations operating abroad," as well as "foreign affiliates" of domestic corporations, "possess no rights under the First Amendment." *Id.* at 436, 140 S.Ct. 2082. Even in criminal cases, where life and liberty may be at stake, foreign citizens abroad cannot claim constitutional protections. *See, e.g., United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (Fourth Amendment); *Johnson v. Eisentrager*, 339 U.S. 763, 784, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (Fifth Amendment). Several scholars have explained that this principle logically extends to the personal-jurisdiction context. [37]

Given this precedent, should a separate foreign corporation that has structured its activities to benefit from the U.S. market without entering the country directly be able to invoke constitutional limits on the jurisdiction of American courts in a civil suit for harm caused by its product? As just explained, "[t]he American Constitution exists primarily to secure the rights of Americans." *Douglass*, 46 F.4th at 281 (Elrod,

J., dissenting). Constitutional limits on personal jurisdiction would not apply if the corporation were charged criminally or if a foreign individual sent a harmful product into the country, and such a corporation cannot claim other important constitutional protections. Yet every relevant Supreme Court decision has assumed that foreign corporations are protected from undesirable litigation in the United States as a matter of due process—without offering any reason why.

Several judges have called this discontinuity into question. Now-Chief Judge Elrod recently criticized the contradiction between demanding the right to stay at home abroad while claiming the due process rights that belong to those at home in the United States. *See id.* Citing to *Asahi* and discussing its application to foreign corporations, Judge Williams has urged that "it may be valuable for courts to reconsider both the merits of the assumption in *Asahi Metal* and kindred cases that private foreign corporations deserve due process protections." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 819 (D.C. Cir. 2012) (Williams, J., concurring). And a D.C. Circuit panel, just a few decades earlier, expressed the same sentiment in an opinion by Judge Randolph: "[a] foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise." *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999). Many scholars have agreed, arguing that foreign corporations generally have no entitlement to due-process protections as an originalist matter. [38] "To the extent that the Constitution is a social contract establishing a system of self-government, permanent outsiders ... seem to have little claim to invoke constitutional 'rights.' " [39]

 **\*21** I discuss these difficulties and debates not to venture an opinion on how they should be resolved but instead to suggest that the very difficulties themselves indicate it is time for the Supreme Court to reexamine the fairness-based approach to personal jurisdiction that gives rise to them. As I explain next, consulting our history and tradition reveals a very different relationship between the Constitution and limits on courts' personal jurisdiction over defendants.

**B**

To no part of the Constitution can one trace *International Shoe* and its progeny. Considering the Due Process Clauses' text and history, nothing there offers an objective basis for determining when an exercise of personal jurisdiction would be "fair" to a foreign corporate defendant.

Almost a century after the American Founding, courts assessing personal jurisdiction over a defendant began asking a novel question: whether the exercise of personal jurisdiction in a given case comported with due process. Courts today automatically associate restrictions on the assertion of personal jurisdiction with due process. But why? What constitutional role could due process play in imposing nonprocedural limits on the scope of a court's personal jurisdiction? And are courts correct in automatically associating personal jurisdiction with due process without constitutional support on point?

From an originalist perspective, the phrase "due process" provides no basis for divining territorial limits that can be used to answer questions of personal jurisdiction. [40] Limits on a court's personal jurisdiction over a defendant have always existed; [41] their connection to constitutional due process has not. As one scholar has explained, "[w]hen American courts first began articulating limits on personal jurisdiction, they didn't look to state or federal due process clauses, but to rules of general or international law that regulated the authority of separate sovereigns." [42]

"States that wanted to exercise broad jurisdiction would do so, and would execute judgments within their borders on as much of the defendant's property as they could find." [43] These judgments were entitled to full faith and credit in other States, but only to the extent they complied with customary law and international conventions, [44] which focused on "a state's sovereign power over persons or property within its territory." [45] Within this practice, constitutional principles of due process played an indirect and procedural role, limiting enforcement of judgments rendered without personal jurisdiction according to substantive customary limits on the sovereign's jurisdiction to adjudicate. Defendants could challenge a judgment's enforcement through "remov[al of] their cases into federal court or ... through diversity suits." [46] There, "[a] judgment without jurisdiction was void, and it wouldn't count as 'due process of law' to" enforce such a judgment depriving the defendant of life, liberty, or property. [47]

 **\*22**  Following *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1878), American courts began rooting personal jurisdiction in due process. But *Pennoyer* did not hold that the Constitution itself dictated substantive limits on personal

jurisdiction. [48] Instead, *Pennoyer* simply recognized what the then-new Due Process Clause of the Fourteenth Amendment had done: "creat[ed] an obligation for state courts—one that hadn't existed before [*Pennoyer*]—to follow the federal courts' lead on questions of personal jurisdiction" as a matter of cooperative federalism. [49] Both federal and state courts were still looking to traditional territorial rules of personal jurisdiction—not to the Constitution itself—to answer those questions, however. In other words,

> The Fourteenth Amendment changed th[e] picture for state courts, because it enabled direct federal-question review of their jurisdictional rulings: as *Pennoyer* explained, "proceedings in a court of justice to determine the personal rights and obligations of parties over whom that court has no jurisdiction do not constitute due process of law." [50]

This view finds strong support in *Pennoyer* itself. There, the Court held that an Oregon state court lacked jurisdiction over a nonresident defendant. But nothing in the Due Process Clause inspired that holding: instead, *Pennoyer* rooted it in principles of sovereignty derived from customary law that had existed for centuries. Courts long held that a forum's "attempt to give ex-territorial operation to its laws, or to enforce ... ex-territorial jurisdiction by its tribunals, would be deemed an encroachment upon the *independence of the State* in which the persons are domiciled or the property is situated." *Pennoyer, 95 U.S. at 723* (emphasis added).

What due process meant in this context, as *Pennoyer* reaffirmed, was that an "exertion of power affecting private rights" can occur only through "a course of legal proceedings [that] accord[ ] to those rules and principles which have been established in our systems of jurisprudence for the protection and enforcement of private rights." *Id.* at 733. In the era of *Pennoyer*, those rules and principles required that a defendant "be brought within [the State's] jurisdiction by service of process within the State, or [the defendant's] voluntary appearance." *Id.* The Oregon state court's exercise of jurisdiction did not comport with those customs, so the Supreme Court decided that the judgment sought to be enforced was invalid and not constitutionally recognizable.

One benefit of not constitutionalizing substantive limits on personal jurisdiction, as Justice Story recognized long ago, is that they can be adjusted by the politically accountable branches as times change. Should Congress and the President conclude that customary limits on courts' jurisdiction to adjudicate are out of step with the modern world, they would

retain the power to change the applicable rules by statute. *See Picquet v. Swan*, 19 F. Cas. 609 (C.C.D. Mass. 1828) (No. 11,134) (Story, J.) (explaining that general jurisdictional principles, which kept with the law of nations, applied unless Congress clearly and expressly legislated otherwise). [51]

**\*23** In sum, the text of the Due Process Clauses offers no guidance on what constitutes a "stream of commerce." And as a historical matter, the Constitution always permitted American courts—state and federal—to rely on customary principles of sovereignty in assessing personal jurisdiction, as demonstrated by the common practice near the time of the Founding and nearly a century thereafter. True, the current regime ushered in under *International Shoe* has existed for almost 80 years, and uprooting it to restore the early American tradition would surely create new questions that courts would be left to answer. But perhaps not: "*Pennoyer*'s reasoning can be right without *International Shoe*'s outcome being wrong; international law and American practice might just be different now than they were in 1878 or 1945." [52]

\* \* \*

So where do we go from here? As far as I can tell, the Supreme Court's decision in *Mallory v. Norfolk Southern Railway Co.* was a step in the right direction. 600 U.S. 122, 143 S.Ct. 2028, 216 L.Ed.2d 815 (2023). That case revived—or, more correctly put, reaffirmed—an early American court practice of exercising jurisdiction over corporations through consent-by-registration statutes. *See id.* at 137, 143 S.Ct. 2028. But as long as *International Shoe*'s ahistorical appeal to "fairness" remains, the doctrine will continue to befuddle judges and bedevil parties with an eye-of-the-beholder quality that the Supreme Court has, despite its best efforts, failed to tame.

I encourage the Supreme Court to consider returning the personal-jurisdiction inquiry to the touchstone *Pennoyer* identified: sovereign power. The Fourteenth Amendment's role under this originalist approach is simple: channeling federal-question review of a state court's exercise of personal jurisdiction to ensure compliance with traditional limits on sovereignty. Courts would not look to the Constitution to give content to these prevailing limits on when a sovereign's courts can exercise jurisdiction to adjudicate. Instead, courts would take guidance from the customary law regarding territorial rules of personal jurisdiction. I hope the cobbler will soon take *International Shoe* and its fairness-based regime back to the workshop to consider such an originalist "resoling." [53]

**All Citations**

--- S.W.3d ----, 2025 WL 1727903

---

**Footnotes**

1    326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). We are bound to follow U.S. Supreme Court precedent on questions of federal constitutional law. *See* Josh Blackman, *Originalism and Stare Decisis in the Lower Courts*, 13 N.Y.U. J.L. & LIBERTY 44, 51 (2019). "[F]idelity to Supreme Court precedent must trump fidelity to text and original public meaning." *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 246 (5th Cir. 2022) (Ho, J., concurring).

2    True, the Supreme Court's opinions have sometimes considered other principles when discussing personal jurisdiction. *See, e.g., J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 879, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011) (plurality opinion) (sovereign authority of the State); *Calder v. Jones*, 465 U.S. 783, 788, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (convenience to and burden on the parties); *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (individual liberty). But each case eventually reduces to one basic question: is exercising personal jurisdiction over the defendant consistent with "overall principles of fairness"? Richard D. Freer, *Personal Jurisdiction in the Twenty-First Century: The Ironic Legacy of Justice Brennan*, 63 S.C. L. REV. 551, 554 (2012).

3    *See, e.g., Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 269, 137 S.Ct. 1773, 198 L.Ed.2d 395 (2017) (Sotomayor, J., dissenting) ("A core concern in this Court's personal jurisdiction cases is fairness.");

*Nicastro*, 564 U.S. at 903, 131 S.Ct. 2780 (Ginsburg, J., dissenting) ("The modern approach to jurisdiction over corporations and other legal entities, ushered in by *International Shoe*, gave prime place to reason and fairness."); *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 427, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (Brennan, J., dissenting) ("[T]he principal focus when determining whether a forum may constitutionally assert jurisdiction over a nonresident defendant has been on fairness and reasonableness to the defendant."); *Ins. Corp. of Ir.*, 456 U.S. at 713-14, 102 S.Ct. 2099 (Powell, J., concurring) ("Whenever the Court's notions of fairness are not offended, jurisdiction apparently may be upheld.").

4    Mila Sohoni, *The Puzzle of Procedural Originalism*, 72 DUKE L.J. 941, 990 (2023).

5    Stephen E. Sachs, *How Congress Should Fix Personal Jurisdiction*, 108 NW. U. L. REV. 1301, 1305 (2014) [hereinafter Sachs, *Fix Personal Jurisdiction*].

6    Kevin C. McMunigal, *Desert, Utility, and Minimum Contacts: Toward a Mixed Theory of Personal Jurisdiction*, 108 YALE L.J. 189, 189 (1998); *see also* Roger H. Trangsrud, *The Federal Common Law of Personal Jurisdiction*, 57 GEO. WASH. L. REV. 849, 850 (1989) ("[T]he Supreme Court ... has failed to expound a coherent theory of the limits of state sovereignty over noncitizens or aliens.").

7    *See* Christina Ackemjack, *Federal Personal Jurisdiction: Derailing Corporate-Friendly Litigation*, 4 ST. THOMAS J. COMPLEX LITIG. 41, 41 (2018) (explaining that state courts are uncertain about when jurisdiction is proper given the lack of "clear and predictable rules"); Tracy O. Appleton, *The Line Between Liberty and Union: Exercising Personal Jurisdiction over Officials from Other States*, 107 COLUM. L. REV. 1944, 1990 (2007) ("[A]ll states suffer from the unpredictability of current personal jurisdiction rules."); *see also* Angela M. Laughlin, *This Ain't the Texas Two Step Folks: Disharmony, Confusion, and the Unfair Nature of Personal Jurisdiction Analysis in the Fifth Circuit*, 37 CAP. U. L. REV. 681 (2009) [hereinafter Laughlin, *Texas Two Step*].

8    *See* Sachs, *Fix Personal Jurisdiction*, at 1307 ("The more malleable the doctrine, the broader the forum shopping opportunities of highly sophisticated plaintiffs, who can select courts with plaintiff-friendly judges, juries, procedures, or choice of law.").

9    *See* Laughlin, *Texas Two Step*, at 727 app. A.

10   *See* Bryce A. Lenox, *Personal Jurisdiction in Cyberspace: Teaching the Stream of Commerce Dog New Internet Tricks: CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir. 1996), 22 U. DAYTON L. REV. 331, 345 n.129 (1997); Renaud Sorieul et al., *Establishing a Legal Framework for Electronic Commerce: The Work of the United Nations Commission on International Trade Law (UNCITRAL)*, 35 INT'L LAW. 107, 121 (2001) (discussing conflicting outcomes on substantially similar facts among courts where personal jurisdiction is based on internet-related contacts with forums).

11   *See* Laughlin, *Texas Two Step*, at 727 app. A (demonstrating how different States apply different standards —*i.e.*, some apply "pure" stream of commerce, others require "plus," and a few apply an unclear hybrid standard).

12   *Compare Bridgeport Music, Inc. v. Still N the Water Publ'g*, 327 F.3d 472, 479-480 (6th Cir. 2003) (following stream-of-commerce-*plus* test), *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945-46 (4th Cir. 1994) (same), *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 683 (1st Cir. 1992) (same), *and Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) (same), *with Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 613-15 (8th Cir. 1994) (following "*pure*" stream-of-commerce test), *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 420 (5th Cir. 1993) (same), *and Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 (7th Cir. 1992) (same). Some federal circuits have refused to choose a side. *See, e.g., Monge v. RG Petro-Mach. (Grp.) Co.*, 701 F.3d 598, 620 (10th Cir. 2012); *Vermeulen v. Renault, U.S.A., Inc.*,

985 F.2d 1534, 1548 (11th Cir. 1993); *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 244 (2d Cir. 1999); *Akro Corp. v. Luker*, 45 F.3d 1541, 1545 (Fed. Cir. 1995); *Renner v. Lanard Toys Ltd.*, 33 F.3d 277 (3d Cir. 1994). But most of the States within those circuits have selected one governing standard. *See* Laughlin, *Texas Two Step*, at 727 app. A.

13    *See* Laughlin, *Texas Two Step*, at 727 app. A (illustrating conflicts between federal circuit courts and States within those circuits).

14    *See, e.g., Mallory v. Norfolk So. Ry.*, 600 U.S. 122, 143 S.Ct. 2028, 216 L.Ed.2d 815 (2023) (partial plurality opinion); *Nicastro*, 564 U.S. at 883, 131 S.Ct. 2780 (plurality opinion); *Burnham v. Super. Ct. of Cal.*, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990) (plurality opinion); *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion); *World-Wide Volkswagen*, 444 U.S. at 286, 100 S.Ct. 580 (plurality opinion).

15    *Compare Ford*, 592 U.S. at 373, 141 S.Ct. 1017 (Alito, J., concurring), *with id.* at 375-78, 141 S.Ct. 1017 (Gorsuch, J., concurring).

16    Laughlin, *Texas Two Step*, at 712.

17    *Erie*, of course, curtailed federal common law. But the principles underlying *Erie*—its "twin aims," *see Hanna v. Plumer*, 380 U.S. 460, 467, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)—apply with great force in requiring procedural fairness here too. As explained below, where entry into federal court is easier than entry into state court— especially when the courts are within the same federal circuit—plaintiffs are incentivized to forum shop and the law is necessarily inequitable in opening the courthouse gates. Although the Court's personal-jurisdiction precedent currently permits that inequity, the Constitution and the practical underpinnings of the Court's related doctrines surely do not.

18    Justice Stevens also concurred, arguing the plurality's creation of an "intent or purpose" test was unnecessary to decide the case. *Asahi*, 480 U.S. at 121, 107 S.Ct. 1026 (Stevens, J., concurring).

19    *See, e.g.*, Robert C. Casad, *Personal Jurisdiction in Federal Question Cases*, 70 TEX. L. REV. 1589, 1593 (1992) (explaining how lack of clarity in stream-of-commerce theory yields confusion, inconsistent holdings, and unpredictable results); Erik T. Moe, Comment, Asahi Metal Industry Co. v. Superior Court: *The Stream of Commerce Doctrine, Barely Alive but Still Kicking*, 76 GEO. L.J. 203, 213-15 (1987) (discussing cases that reach opposite holdings on similar facts given Supreme Court's conflicting guidance on stream-of-commerce theory).

20    *Compare Gavigan v. Walt Disney World, Inc.*, 646 F. Supp. 786, 787-88 (E.D. Pa. 1986) (subject to jurisdiction for actively soliciting clientele in the forum), *Walker v. Carnival Cruise Lines*, 681 F. Supp. 470, 476 (N.D. Ill. 1987) (same), *and Oliff v. Kiamesha Concord, Inc.*, 106 N.J.Super. 121, 254 A.2d 330, 333 (1969) (same), *with Whalen v. Walt Disney World Co.*, 274 Pa.Super. 246, 418 A.2d 389, 392 (1980) (not subject to jurisdiction for similar contacts), *Dirks v. Carnival Cruise Lines*, 642 F. Supp. 971, 975 (D. Kan. 1986) (same), *and Miller v. Kiamesha-Concord, Inc.*, 420 Pa. 604, 218 A.2d 309, 311 (1966) (same). *Compare also Volkswagenwerk, A. G. v. Klippan GmbH*, 611 P.2d 498, 511 (Alaska 1980) (permitting jurisdiction under stream-of-commerce theory over German car-seat manufacturer because manufacturer designed, manufactured and sold product to company knowing it would market product throughout the United States), *with Humble v. Toyota Motor Co.*, 727 F.2d 709, 710 (8th Cir. 1984) (rejecting jurisdiction under stream-of-commerce-plus theory over Japanese car-seat manufacturer on similar facts because suit in forum was only foreseeable).

21    *See, e.g., ATEN Int'l Co. v. Emine Tech. Co.*, 261 F.R.D. 112, 118-121 (E.D. Tex. 2009); *Sunshine Kids Found. v. Sunshine Kids Juv. Prods., Inc.*, No. H-09-2496, 2009 WL 5170215 (S.D. Tex. Dec. 18, 2009);

*Ritzmann v. Nalu Kai, Inc.*, 523 F. Supp. 2d 564 (S.D. Tex. 2007); *Animale Grp., Inc. v. Sunny's Perfume, Inc.*, No. 5:07-cv-13, 2007 WL 760373 (S.D. Tex. Mar. 8, 2007); *Philip Morris USA, Inc. v. Lee*, No. EP-05-CV-490-PRM, 2006 WL 4659839 (W.D. Tex. Dec. 28, 2006); *Sorkin v. Dayton Superior Corp.*, No. H-06-1318, 2006 WL 2141255 (S.D. Tex. July 28, 2006); *Biggs v. Bass Pro Outdoor World, LLC*, No. 304CV1920R, 2005 WL 1511129 (N.D. Tex. June 27, 2005).

22 Only 20 years ago, the question whether "plus" was required for personal jurisdiction in Texas state courts remained unclear. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 786 (Tex. 2005) ("Whichever of these standards is ultimately correct, [the defendant]'s conduct meets none of them.").

23 Unfortunately, given the prevailing confusion regarding the "fairness" analysis of personal jurisdiction and the stream-of-commerce concept specifically, these faithful attempts are sometimes unsuccessful. *See, e.g., Hyundam Indus. Co. v. Swacina*, No. 24-0207, --- S.W.3d ——, slip op. at ——, 2025 WL 1717010 (Tex. June 20, 2025); *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 350 (Tex. 2023) (noting "multiple decisions of our courts of appeals ... involving factually similar claims ... yielding seemingly conflicting conclusions about whether personal jurisdiction exists" under stream-of-commerce-plus test); *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 417 (Tex. 2023) (reversing court of appeals' judgment and holding Texas court had personal jurisdiction over German manufacturer in case not "involv[ing] a typical stream-of-commerce scenario").

24 *See, e.g., Ethridge v. Samsung SDI Co.*, 137 F.4th 309, 323 (5th Cir. 2025) (Oldham, J.) ("The doctrine does not come from constitutional text or original law."); Lawrence B. Solum & Max Crema, *Originalism and Personal Jurisdiction: Several Questions and a Few Answers*, 73 ALA. L. REV. 483, 486 (2022) [hereinafter Solum & Crema, *Originalism and Personal Jurisdiction*] ("[I]t seems very unlikely that *International Shoe*'s 'fair play and substantial justice' standard can be grounded in the original meaning of the 1868 text.").

25 Sachs, *Fix Personal Jurisdiction*, at 1304.

26 *See* James Weinstein, *The Federal Common Law Origins of Judicial Jurisdiction: Implications for Modern Doctrine*, 90 VA. L. REV. 169, 171 (2004) ("Although the extensive body of commentary on federally imposed limitations of state court jurisdiction agrees on very little, the one point of consensus is that Supreme Court personal jurisdiction doctrine is deeply confused."); James P. George, *Running on Empty: Ford v. Montana and the Folly of Minimum Contacts*, 30 GEO. MASON L. REV. 1, 5 (2022) (calling personal jurisdiction doctrine "an unworkable maze of a test whose precedents are a repetitive patchwork of contradictions").

27 Allan Erbsen, *Impersonal Jurisdiction*, 60 EMORY L.J. 1, 3 (2010).

28 *Compare Kulko v. Super. Ct. of Cal.*, 436 U.S. 84, 97, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) (holding burden too great where East Coast resident forced to litigate on the West Coast), *with Calder*, 465 U.S. at 789-790, 104 S.Ct. 1482 (holding burden not too great where East Coast resident forced to litigate on the West Coast).

29 *Compare McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (emphasizing plaintiff's interest in suing out-of-state defendant in convenient local forum), *with Kulko*, 436 U.S. at 100 n.15, 98 S.Ct. 1690 (deemphasizing plaintiff's interest in suing defendant in convenient local forum).

30 *See* Solum & Crema, *Originalism and Personal Jurisdiction*, at 485 ("*International Shoe*'s adoption of the minimum-contacts and fairness standard as the test for compliance with the Due Process of Law Clauses is a paradigm case of living constitutionalism.").

31 *See also Frene v. Louisville Cement Co.*, 134 F.2d 511, 516 (D.C. Cir. 1943) (Rutledge, J.) ("In general the trend has been toward a wider assertion of power over nonresidents and foreign corporations....").

32 *See World air passenger traffic evolution, 1980-2020*, INT'L ENERGY AGENCY, https://www.iea.org/data-and-statistics/charts/world-air-passenger-traffic-evolution-1980-2020 (showing how during the 1980s, world air-passenger traffic was less than a billion passengers annually, but how recently the number has reached nearly five billion yearly passengers).

33 John F. Coyle, *Financial Hardship and Forum Selection Clauses*, 103 N.C. L. REV. 641, 646 (2025) ("When a wealthy corporation is directed to litigate in a distant forum, it will typically have the resources to do so.").

34 Only two Terms ago, a plurality of the Supreme Court revisited part of its doctrine concerning corporations and personal jurisdiction. *See Mallory*, 600 U.S. 122, 143 S.Ct. 2028, 216 L.Ed.2d 815. Now, in States where there is a consent-by-registration statute on the books, a corporation is said to have consented to personal jurisdiction in that forum as a condition for doing business there—think something akin to "tag" jurisdiction for individuals. But outside this context, *International Shoe* remains alive and well. *Id.* at 146 n.11, 143 S.Ct. 2028 ("*International Shoe* governs where a defendant has not consented to exercise of jurisdiction.").

35 Robert H. Jackson, *What Price "Due Process?"* 5 N.Y. L. REV. 435, 436 (1927) (explaining how corporations invoke their foreign charter when confronted with personal jurisdiction, enjoying the forum's economic benefits while avoiding liability there).

36 For example, a family business operating out of a Texas home and selling on eBay might be subjected to nationwide jurisdiction under the "pure" stream-of-commerce test solely because it foresaw its product reaching another forum. But it is for these small enterprises that nationwide jurisdiction is most "unfair" from a burden standpoint. *See* Peter L. Markowitz & Lindsay C. Nash, *Constitutional Venue*, 66 FLA. L. REV. 1153, 1209 (2014).

37 Aaron D. Simowitz, *Legislating Transnational Jurisdiction*, 57 VA. J. INT'L L. 325, 351 (2018) ("The right of foreign defendants to benefit from the protections of ... [d]ue [p]rocess personal jurisdiction is unclear."); Lea Brilmayer & Matthew Smith, *The (Theoretical) Future of Personal Jurisdiction: Issues Left Open by Goodyear Dunlop Tires v. Brown and J. McIntyre Machinery v. Nicastro*, 63 S.C. L. REV. 617, 633 (2012) (granting foreign defendants due-process protections is "both highly controversial and contrary to other Supreme Court precedent" in other contexts); Austen L. Parrish, *Sovereignty, Not Due Process: Personal Jurisdiction over Nonresident Alien Defendants*, 41 WAKE FOREST L. REV. 1, 33 (2006) [hereinafter Parrish, *Not Due Process*] (arguing foreign private defendants should not be granted due-process protections in the personal-jurisdiction context).

38 *See* Parrish, *Not Due Process*, at 33-34 ("Several academics have convincingly argued that the Framers never intended [the Due Process Clauses of the Fifth or Fourteenth Amendment] to limit territorial assertions of power even in the domestic context," and the "logic applies with greater force when the case involves a foreign defendant.").

39 Lori Fisler Damrosch, *Foreign States and the Constitution*, 73 VA. L. REV. 483, 487 (1987).

40 *See* Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 VA. L. REV. 1703 (2020) [hereinafter Sachs, *Unlimited Jurisdiction*]; *see also* Stephen E. Sachs, Pennoyer *Was Right*, 95 TEX. L. REV. 1249 (2017) [hereinafter Sachs, Pennoyer *Was Right*].

41 Before *Pennoyer*, these limits on state judgments, as a matter of customary law, simplified into one question: "whether anyone else would listen to them." Sachs, Pennoyer *Was Right*, at 1274; *see, e.g., Hart v. Granger*, 1 Conn. 154, 168-69 (1814) (holding that if defendant is "so within the jurisdiction of the court," "they can be *commanded*" "to appear and answer").

42    Sachs, *Unlimited Jurisdiction*, at 1708-09. *See, e.g., Hitchcock v. Aicken*, 1 Cai. 460, 481 (N.Y. Sup. Ct. 1803) (opinion of Kent, J.); *id.* at 478 (opinion of Radcliff, J.); *accord Picket v. Johns*, 16 N.C. 123, 131 1827 (opinion of Henderson, J.).

43    Sachs, Pennoyer *Was Right*, at 1270.

44    *See, e.g., Hall v. Williams*, 23 Mass. 232, 238 (1828) (holding "principles of the common law" applying "to judgments of the tribunals of foreign countries" were still just as applicable "to the judgments of the courts of the several States when sought to be enforced").

45    Sachs, Pennoyer *Was Right*, at 1287.

46    *Id.*

47    Sachs, *Unlimited Jurisdiction*, at 1722-23. Professor Sachs' argument fits squarely within the doctrine articulated in *Erie*: although state and federal courts could disagree on the content of general law prior to *Erie, see Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 18-19, 10 L.Ed. 865 (1842), "they couldn't disagree any longer about personal jurisdiction, because due process issues were subject to federal-question review on direct appeal." Sachs, *Unlimited Jurisdiction*, at 1725.

48    Wendy Collins Perdue, *What's "Sovereignty" Got to Do with It? Due Process, Personal Jurisdiction, and the Supreme Court*, 63 S.C. L. REV. 729, 732 (2012) (viewing due process as a "hook" for exercising jurisdiction); Sachs, Pennoyer *Was Right*, at 1288.

49    Sachs, Pennoyer *Was Right*, at 1288-89.

50    Sachs, *Unlimited Jurisdiction*, at 1709 (quoting *Pennoyer*, 95 U.S. at 733).

51    As Justice Story further explained, Congress could authorize unlimited federal-court jurisdiction by acting clearly enough, and if Congress did so, "the court would certainly be bound to follow it." *Picquet v. Swan*, 19 F. Cas. 609, 615 (C.C.D. Mass. 1828) (No. 11,134).

52    Sachs, Pennoyer *Was Right*, at 1250.

53    Donald L. Doernberg, *Resoling International Shoe*, 2 TEX. A&M L. REV. 247 (2014).

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2025 WL 1717010
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED
FOR PUBLICATION IN THE PERMANENT
LAW REPORTS. UNTIL RELEASED, IT IS
SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Texas.

HYUNDAM INDUSTRIAL
COMPANY, LTD., Petitioner,

v.

Paul SWACINA, as Successor Guardian of the Person
and Estate of Johari Kibibi Powell, an Incapacitated
Person, and Paul Swacina as Next Friend of D.A.P.,
D.A.C., and D.A.C., Minor Children, Respondents

No. 24-0207
|
OPINION DELIVERED: June 20, 2025

**Synopsis**
**Background:** Guardian of the person and estate of
incapacitated motorist filed products liability action against
South Korean fuel pump manufacturer and others on
motorist's behalf and as next friend of motorist's children,
seeking to recover for injuries motorist sustained when her
vehicle was rear-ended after it stalled in the center lane of
traffic due to a fuel pump failure, and to recover for children's
loss of parental consortium, under theories of negligence,
gross negligence, misrepresentation, as well as design,
manufacturing, and marketing defects. The County Court
at Law No. 1, Nueces County, Robert J. Vargas, J., denied
guardian's motion to strike affidavit of managing director
of manufacturer's technical research and development center
and denied manufacturer's special appearance. Manufacturer
filed an interlocutory appeal, and guardian cross-appealed.
The Court of Appeals, 692 S.W.3d 734, affirmed, and
manufacturer filed petition for review.

**Holdings:** The Supreme Court held that:

[1] affidavit of managing director of fuel pump
manufacturer's research and development center was
sufficiently based on director's personal knowledge;

[2] manufacturer did not purposefully avail itself of the Texas
market, and thus, manufacturer was not subject to specific
personal jurisdiction; and

[3] manufacturer's action of designing fuel pump for North
American specifications did not constitute conduct targeting
Texas for personal jurisdiction purposes.

Reversed and rendered.

**Procedural Posture(s):** On Appeal; Motion to Strike
Affidavit.

West Headnotes (18)

**[1]    Appeal and Error** 👈

Claim brought by guardian of person of
incapacitated motorist, alleging that trial court
abused its discretion by denying guardian's
motion to strike affidavit of director of South
Korean fuel pump manufacturer's research
and development center because affiant lacked
personal knowledge, was not forfeited on
appeal by guardian's failure to file cross-
petition in his products liability action against
manufacturer, seeking to recover for injuries
motorist sustained when her vehicle was rear-
ended after it stalled in traffic due to fuel pump
failure; although guardian raised his personal-
knowledge argument in his merits brief in
Supreme Court and not by cross-petition for
review, he argued alternative ground to affirm
Court of Appeals' judgment and did not seek
to alter judgment, rule provided that party who
sought to alter Court of Appeals' judgment had
to file petition for review, and rule did not require
cross-petition when party raised argument as
alternative basis to support judgment. Tex. R.
App. P. 53.1; Tex. R. Civ. P. 120a(3).

**[2]    Affidavits** 👈

To satisfy the personal-knowledge requirement
for affidavit attached to a special appearance, the
affiant must swear that the facts presented in the
affidavit reflect his personal knowledge; affiant's

belief about the facts is legally insufficient. Tex. R. Civ. P. 120a(3).

**[3]    Affidavits** 🔑

Affiant's job responsibilities can give him personal knowledge of a company's operations and can establish how he learned of the facts asserted for purposes of statute providing that any affidavit attached to a special appearance shall be made on personal knowledge. Tex. R. Civ. P. 120a(3).

**[4]    Affidavits** 🔑

Merely stating that the facts are within the affiant's personal knowledge is conclusory and insufficient to satisfy the personal-knowledge requirement for purposes of statute providing that any affidavit attached to a special appearance shall be made on personal knowledge. Tex. R. Civ. P. 120a(3).

**[5]    Affidavits** 🔑

Affidavit of director of South Korean fuel pump manufacturer's research and development center was sufficiently based on director's personal knowledge for purposes of statute providing that any affidavit attached to a special appearance shall be made on personal knowledge, and thus, trial court did not abuse its discretion by denying motion to strike affidavit in products liability action brought against manufacturer by guardian of the person and estate of incapacitated motorist, seeking to recover for injuries motorist sustained when her vehicle was rear-ended after it stalled in traffic due to fuel pump failure; director laid foundation for his personal knowledge by detailing his extensive experience at manufacturer, knowledge he obtained in each role, and documents he reviewed to prepare his affidavit, and director obtained contracts for new vehicle models, learned distribution chain of manufacturer's fuel pumps, and was privy to information on its sales and marketing practices. Tex. R. Civ. P. 120a(3).

More cases on this issue

**[6]    Courts** 🔑

South Korean fuel pump manufacturer did not purposefully avail itself of the Texas market, and thus, manufacturer was not subject to specific personal jurisdiction in products liability action brought against manufacturer by guardian of the person and estate of incapacitated motorist, seeking to recover for injuries motorist sustained when her vehicle was rear-ended after it stalled in traffic due to fuel pump failure; manufacturer had no control over where vehicles containing its fuel pumps were sold, it had never sought to do business in Texas, it maintained no offices, employees, or agents in Texas, and it did not advertise, market, or sell its products in Texas.

More cases on this issue

**[7]    Courts** 🔑

Texas court may exercise specific personal jurisdiction when the non-resident defendant purposefully avails itself of the privilege of conducting activities within the forum state and the plaintiff's claims arise out of or relate to those forum contacts.

**[8]    Courts** 🔑

When considering whether non-resident defendant purposefully availed itself of Texas market, such that Texas court has specific personal jurisdiction over defendant, courts consider only the defendant's contacts with the forum, not the unilateral activity of another party or a third person.

**[9]    Courts** 🔑

Non-resident defendant's contacts with Texas must be purposeful, not random, fortuitous, or attenuated, and defendant must seek some benefit, advantage, or profit by availing itself of Texas's jurisdiction in order for Texas court to have specific personal jurisdiction over defendant.

More cases on this issue

**[10]** **Courts**

To engage in purposeful availment, for purposes of specific personal jurisdiction, non-resident defendant must undertake some additional conduct—beyond merely placing the product in the stream of commerce—that indicates an intent or purpose to serve the market in the forum state.

**[11]** **Courts**

Mere awareness, or foreseeability, of a product's sale or distribution in Texas, alone, cannot create minimum contacts sufficient to support specific personal jurisdiction over non-resident defendant.

**[12]** **Courts**

Non-resident defendant must specifically target Texas to be subject to specific personal jurisdiction in Texas; it is not enough that a defendant may foresee some of its products eventually arriving in Texas.

**[13]** **Courts**

South Korean fuel pump manufacturer's action of designing fuel pump for North American specifications did not constitute conduct targeting Texas, and thus, manufacturer was not subject to specific personal jurisdiction in products liability action brought against manufacturer by guardian of the person and estate of incapacitated motorist, seeking to recover for injuries motorist sustained when her vehicle was rear-ended after it stalled in traffic due to fuel pump failure; manufacturer did not design fuel pump for Texas, but, rather, for expansive North American region which contained the United States' 50 states and 22 other countries, and manufacturer's mere foreseeability or awareness that fuel pump might be sold in Texas, standing alone, was insufficient to subject it to personal jurisdiction in Texas.

**[14]** **Courts**

It is the non-resident defendant's purposeful contacts with Texas—not a larger region in which Texas sits—that are relevant to court's personal-jurisdiction inquiry.

**[15]** **Courts**

Foreign manufacturer need not design its products specifically for Texas to purposefully avail itself of the Texas market for personal jurisdiction purposes, but a foreign manufacturer must engage in some conduct targeting Texas.

**[16]** **Courts**

Fact that one of South Korean manufacturer's fuel pumps was purchased in Texas was insufficient to show that manufacturer acted through an agent or intermediary to intentionally target Texas for purposes of determining if manufacturer was subject to specific personal jurisdiction in products liability action brought against manufacturer by guardian of the person and estate of incapacitated motorist, seeking to recover for injuries motorist sustained when her vehicle was rear-ended after it stalled in traffic due to fuel pump failure.

More cases on this issue

**[17]** **Courts**

Evidence that South Korean fuel pump manufacturer maintained a website in English, without more, failed to show that manufacturer targeted Texas for purposes of determining if manufacturer was subject to specific personal jurisdiction in products liability action brought against manufacturer by guardian of the person and estate of incapacitated motorist, seeking to recover for injuries motorist sustained when her vehicle was rear-ended after it stalled in traffic due to fuel pump failure.

More cases on this issue

**[18]    Courts** 👈

Evidence of third party's car sales was legally insufficient to show that South Koran fuel pump manufacturer targeted Texas for purposes of determining if manufacturer was subject to specific personal jurisdiction in products liability action brought against manufacturer by guardian of the person and estate of incapacitated motorist, seeking to recover for injuries motorist sustained when her vehicle was rear-ended after it stalled in traffic due to fuel pump failure; court would not consider the unilateral activity of a third party in assessing manufacturer's contacts with Texas.

More cases on this issue

On Petition for Review from the Court of Appeals for the Thirteenth District of Texas, Honorable Nora Longoria.

**Attorneys and Law Firms**

Scott T. Staha, Corpus Christi, for Respondents.

Melissa Dorman Matthews, Plano, David William Green, for Petitioner.

Michael W. Eady, Austin, for Amici Curiae Texas Association of Defense Counsel, International Association of Defense Counsel.

**Opinion**

PER CURIAM

**\*1**  At issue here is whether a Texas court may exercise personal jurisdiction over Hyundam Industrial Company, Ltd., a South Korean company that manufactures automobile parts. As we reaffirm today in *BRP-Rotax GmbH & Co. KG v. Shaik*, "a defendant [must] *specifically target* Texas" to be subject to personal jurisdiction; "it is not enough that a defendant may foresee some of its products' eventually arriving here." —— S.W.3d ——, 2025 WL 1716879 (Tex. June 20, 2025). Because there is no evidence Hyundam targeted Texas, we reverse the judgment of the court of appeals and render judgment dismissing the case against Hyundam.

I

Johari Powell suffered serious injuries when her 2009 Hyundai Elantra stalled in the center lane of traffic and was rear-ended. Powell alleges that the car stalled because its fuel pump failed. Paul Swacina, on behalf of Powell and her minor children, sued multiple defendants in Texas state court for various causes of action related to the car collision. This appeal concerns only defendant Hyundam, the manufacturer of the Elantra's fuel pump.

Hyundam filed a special appearance under Texas Rule of Civil Procedure 120a, requesting that the trial court dismiss the case against it for lack of personal jurisdiction. In support, it attached an affidavit by Jinwook Chang, Managing Director of the Technical R&D Center at Hyundam, explaining that Hyundam designed and manufactured the fuel pump in South Korea. Hyundam designed the fuel pump under Hyundai Motor Company's specifications and subject to its approval. Hyundam sold ninety-nine percent of its fuel pumps to Donghee Industries, Co., a South Korean company. Donghee then incorporated the fuel pumps into a fuel system in South Korea and sold the assembled fuel systems to Hyundai, also a South Korean company, which installed the fuel systems into the Elantra in South Korea. Chang stated that once Hyundam sold the fuel pumps to Donghee, it had no role in producing the Elantra. Hyundam sold the remaining one percent of fuel pumps to Hyundai Mobis Co. Ltd., a South Korean company. Mobis distributes service parts to Hyundai automobile dealers globally, including in Texas, but Hyundam has no control over where Mobis sells its products.

Chang added that Hyundam:

- has never done or sought to do business in Texas;

- has no place of business, employees, or agents in Texas;

- does not advertise, market, export, or sell products in Texas; and

- has no control over where the Elantras containing the fuel pumps are sold or shipped.

Swacina responded to Hyundam's special appearance and presented evidence purporting to show that Hyundam was subject to personal jurisdiction in Texas: (1) Hyundam designed the fuel pump for the North American region and

knew the fuel pumps were sold in Texas; (2) a replacement Hyundam fuel pump was purchased at a Hyundai dealership in Texas; (3) Hyundam maintains a website in English that is accessible in Texas and that says Hyundam has supplied Hyundai with fuel pumps since 1994; and (4) Hyundai sold over 97,000 Elantras in the United States in 2009.

**\*2** Swacina also objected to Chang's affidavit and moved to strike it because, among other things, it was not based on Chang's personal knowledge. The trial court overruled Swacina's objections and denied the motion to strike. The court held a hearing on Hyundam's special appearance and ultimately denied it. Hyundam filed this interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7).

The court of appeals affirmed. It held that the trial court did not abuse its discretion in overruling Swacina's objection to the affidavit. 692 S.W.3d 734, 745 (Tex. App.—Corpus Christi–Edinburg 2023). The court further held that Hyundam purposefully availed itself of the privilege of doing business in Texas by designing its fuel pumps for the North American region. *Id.* at 749. It was "of no consequence" that the North American region includes markets other than Texas because "Hyundam need not 'single Texas out in some unique way to satisfy constitutional dictates.' " *Id.* (quoting *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 420 (Tex. 2023)).

This petition followed.

## II

### A

**[1]** We first consider whether the trial court abused its discretion by overruling Swacina's objection to Chang's affidavit and denying his motion to strike the affidavit. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016) (stating that appellate courts review a trial court's evidentiary rulings for abuse of discretion).[1] It did not.

**[2]** A trial court must "determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX. R. CIV. P. 120a(3). Any affidavit attached to a special appearance "shall be made on personal knowledge, shall set forth specific facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify." *Id.* To satisfy the personal-knowledge requirement, the "affiant must swear that the facts presented in the affidavit reflect his personal knowledge." *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 224 (Tex. 2004). "An affiant's *belief* about the facts is legally insufficient." *Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008).

Chang begins his affidavit by detailing the various roles he held during the seventeen years he worked at Hyundam and the knowledge he gained in each role. As Managing Director of the Technical R&D Center, Chang oversaw "product development for new vehicle models." Chang "routinely attend[ed]" business meetings in which he "obtained personal knowledge" about the fuel pump's "purchasers, product distribution chains, and quantities of the product being sold" and information about Hyundam's "revenues, sales[,] and marketing practices." Throughout the affidavit, Chang asserted that the "facts are within [his] personal knowledge as a result of [his] experience" at Hyundam.

**\*3** **[3]** **[4]** **[5]** An affiant's job responsibilities can give him personal knowledge of a company's operations and can establish how he learned of the facts asserted. *See Valenzuela v. State & Cnty. Mut. Fire Ins. Co.*, 317 S.W.3d 550, 553-54 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Merely stating that the facts are within the affiant's personal knowledge would be conclusory and insufficient to satisfy the personal-knowledge requirement. *See Ryland Grp. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996). But the affidavit here went further. Chang laid a foundation for his personal knowledge by detailing his extensive experience at Hyundam, the knowledge he obtained in each role, and the documents he reviewed to prepare his affidavit. Most relevant here, Chang obtained contracts for new vehicle models, learned the distribution chain of Hyundam's fuel pumps, and was privy to information on its sales and marketing practices.

Because the affidavit was sufficiently based on Chang's personal knowledge, the trial court did not abuse its discretion in overruling Swacina's objection and denying his motion to strike the affidavit.

### B

**[6]** We next consider whether Hyundam purposefully availed itself of the privilege of doing business in Texas such that it is subject to specific personal jurisdiction here. We hold that there is no evidence Hyundam targeted Texas, so it did not purposefully avail itself of the Texas market.

**[7]** **[8]** **[9]** A Texas court may exercise specific personal jurisdiction when the defendant "purposefully avails itself of the privilege of conducting activities within the forum [s]tate" and "the plaintiff's claims 'arise out of or relate to' those forum contacts." *Volkswagen*, 669 S.W.3d at 412-13 (alteration in original) (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359, 141 S.Ct. 1017, 209 L.Ed.2d 225 (2021)). When considering whether the defendant purposefully availed itself of Texas, we consider "only the defendant's contacts with the forum ..., not the unilateral activity of another party or a third person." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007). The defendant's contacts must be "purposeful," not "random, fortuitous, or attenuated." *Id.* Further, the defendant "must seek some benefit, advantage[,] or profit by 'availing' itself of [Texas's] jurisdiction." *Id.* (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)).

**[10]** **[11]** **[12]** To engage in purposeful availment, our precedent requires that the defendant undertake "some 'additional conduct'—beyond merely placing the product in the stream of commerce—that indicates 'an intent or purpose to serve the market in the forum [s]tate.'" *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010) (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion)). As we emphasize today in *BRP-Rotax*, "a key point is that mere awareness, or 'foreseeability,' of a product's sale or distribution in Texas 'alone' cannot 'create minimum contacts' sufficient to 'support personal jurisdiction.'" ––– S.W.3d at –––– (quoting *CSR Ltd. v. Link*, 925 S.W.2d 591, 595-96 (Tex. 1996)); *see also TV Azteca v. Ruiz*, 490 S.W.3d 29, 46 (Tex. 2016). The defendant must *target* Texas; it is not enough that the "defendant *merely foresees* [its] product ending up there." *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 13 (Tex. 2021) (emphasis added).

**[13]** This dispute centers on Chang's deposition testimony that Hyundam "developed and delivered [its] products to satisfy specification for North America." Therefore, "Hyundam knew that Hyundai was selling vehicles with fuel modules built by Hyundam and they were being sold in North America," which, Chang admitted, includes Texas. Swacina argues that designing the fuel pump for North American specifications constitutes additional conduct targeting Texas. We disagree.

**\*4** **[14]** Designing a product for a region that includes Texas makes it foreseeable that the product will end up in Texas. But the fact that Hyundam designed the fuel pump for North America and knew that it was sold in Texas does not, by itself, constitute additional conduct targeting Texas. It is the defendant's purposeful contacts with Texas—not a larger region in which Texas sits—that are relevant to our personal-jurisdiction inquiry. *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 885-86, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011) (plurality opinion). Hyundam did not design the fuel pump for Texas but rather, for the expansive North American region which contains the United States' fifty states and twenty-two other countries. Hyundam had no control over where vehicles containing its fuel pumps were sold. Further, Hyundam has never sought to do business in Texas; maintains no offices, employees, or agents in Texas; and does not advertise, market, or sell its products in Texas.

This case is like *BRP-Rotax*, in which we rejected the argument that a defendant's desire to serve a large region including Texas was evidence of the defendant's purposeful availment of Texas. ––– S.W.3d at ––––. There, a distribution agreement between the defendant and a third party required the third party to advertise and sell the defendant's product in a territory that spanned two large continents and included Texas. *Id.* Here too, Hyundam's designing the fuel pump for the entire North American region "expresses no view, much less any command, about whether any business at all will be transacted in Texas." *Id.*; *see also Nicastro*, 564 U.S. at 886, 131 S.Ct. 2780 (plurality opinion) (holding that a foreign manufacturer had not purposefully availed itself of New Jersey despite its intent to serve the entire United States market). Hyundam's manufacturing the fuel pump for North American specifications makes it foreseeable that some of its products would end up in Texas. But the mere foreseeability or awareness that a product may be sold in Texas, standing alone, is insufficient to subject a defendant to personal jurisdiction in Texas. *CSR*, 925 S.W.2d at 595-96.

This case is unlike *Volkswagen*, in which the defendants purposefully availed themselves of every market in which their vehicles were present, including Texas, by initiating recall and service campaigns. 669 S.W.3d at 420, 424. "[B]ecause 'personal jurisdiction requires a forum-by-forum'

analysis, we look[ed] only to the [defendants'] behavior directed toward Texas, not their behavior directed elsewhere." *Id.* at 420 (quoting *Nicastro*, 564 U.S. at 884, 131 S.Ct. 2780 (plurality opinion)). As we explained, the fact that the defendants similarly targeted other forums did not negate their purposeful availment of Texas:

> The defendant need not single Texas out in some unique way to satisfy constitutional dictates. To hold that a nonresident who has directed activity to *every* state is not amenable to jurisdiction in *any* state would unduly constrain the authority of state courts to hold nonresidents accountable for their in-state conduct and would convert the specific-personal-jurisdiction analysis into a wholly subjective inquiry into the defendants' state of mind.

*Id.* The defendants' targeting of every forum in which their products were located (including Texas) could not mean that they targeted no forum. Only after concluding that the defendants targeted Texas was it necessary for the Court to explain that they "need[ed] not" target Texas "in some unique way" from the other forums they targeted to be subject to personal jurisdiction in Texas. *Id.*

The court of appeals below misapplied *Volkswagen* by stating that "Hyundam need not 'single Texas out in some unique way to satisfy constitutional dictates.' " 692 S.W.3d at 749 (quoting *Volkswagen*, 669 S.W.3d at 420). The court of appeals took *Volkswagen* to mean that a defendant may be subject to personal jurisdiction in Texas if the defendant merely targets a general region that includes Texas. Such a reading flies in the face of our explanation that "the critical inquiry is whether a nonresident defendant has established sufficient contacts with *Texas*—not whether those contacts are materially different from its contacts with other states." *Volkswagen*, 669 S.W.3d at 421 (emphasis added). Unlike in *Volkswagen*, there is no evidence that Hyundam targeted Texas, so our inquiry ends there. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013) (stating that courts look only to the defendant's contacts with Texas).

**\*5** **[15]** To be sure, we are not suggesting that a foreign manufacturer must design its products specifically for Texas to purposefully avail itself of the Texas market. But a foreign manufacturer must engage in some conduct targeting Texas. Hyundam's designing the fuel pump for a general region with no specific targeting of Texas does not clear that bar.

**[16]** Nor do Swacina's three other pieces of evidence show that Hyundam targeted Texas. First, Swacina presented evidence that one of Hyundam's fuel pumps was purchased in Texas. Chang explained in his affidavit that Hyundam sold less than one percent of its fuel pumps to Mobis, a South Korean company that distributes service parts to Hyundai dealerships. Hyundam had no control over where Mobis distributed the fuel pumps. The replacement fuel pump was purchased from Hub Hyundai, a franchised Hyundai dealership—not from Hyundam. Swacina does not explain how Hub Hyundai obtained the fuel pump—be it from Mobis, Hyundai, or Hyundam. Nor is there any evidence that Hyundam had a distribution agreement with any company in the United States, let alone in Texas. *See Asahi*, 480 U.S. at 112, 107 S.Ct. 1026 (plurality opinion) (stating that "[a]dditional conduct" targeting the forum may include "marketing the product through a distributor who has agreed to serve as the sales agent in the forum [s]tate"). The mere fact that a fuel pump was purchased in Texas is insufficient to show that Hyundam acted through an agent or intermediary to intentionally target Texas.

**[17]** Second, evidence that Hyundam maintains a website in English, without more, fails to show that Hyundam targeted Texas. "If any website's mere use of English illustrates an attempt to target Texas specifically—as opposed to the other jurisdictions within our nation and across the world that primarily speak English—then the work of the Texas courts should be expected to grow by massive proportions." *BRP-Rotax*, —— S.W.3d at ——.

**[18]** Third, evidence of Hyundai's Elantra sales is legally insufficient to show that Hyundam targeted Texas. We do not consider the unilateral activity of Hyundai, a third party, in assessing Hyundam's contacts with Texas. *See Moncrief Oil*, 414 S.W.3d at 151. In all, the evidence shows no more than that the "stream [of commerce] eventually swept [Hyundam's] product into" Texas despite Hyundam doing "nothing else to purposefully avail itself of the [Texas] market." *See Asahi*, 480 U.S. at 110, 107 S.Ct. 1026 (plurality opinion).

### III

As in *BRP-Rotax*, our decision today "break[s] no new jurisprudential ground." —— S.W.3d at ——. Hyundam's awareness that its product may end up in Texas is not, standing alone, sufficient to subject it to personal jurisdiction in our courts. Without hearing oral argument, *see* TEX. R. APP. P. 59.1, we grant Hyundam's petition for review, reverse the judgment of the court of appeals, and render judgment dismissing the case against Hyundam.

**All Citations**

--- S.W.3d ----, 2025 WL 1717010

---

**Footnotes**

1   Swacina raised his personal-knowledge argument in his merits brief in this Court and not by cross-petition for review. Swacina's argument is not forfeited by his failure to file a cross-petition because he argues an alternative ground to affirm the court of appeals' judgment and does not seek to alter the judgment. *See* TEX. R. APP. P. 53.1 ("A party who seeks to alter the court of appeals' judgment must file a petition for review."); *Dall./Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 366 n.9 (Tex. 2019) (holding that Rule 53.1 does not require a cross-petition when a party raises an argument "as an alternative basis to support [the] judgment").

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carey Wallick on behalf of Laura Prather
Bar No. 16234200
carey.wallick@haynesboone.com
Envelope ID: 102679369
Filing Code Description: Letter
Filing Description: Yelp's Fifth Notice of Supplemental Authority
Status as of 7/2/2025 9:19 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Lori Mitchell | | Lori.Mitchell@haynesboone.com | 7/2/2025 9:11:04 AM | SENT |
| Robert Farquharson | 24100550 | rob.farquharson@oag.texas.gov | 7/2/2025 9:11:04 AM | SENT |
| Laura Prather | | laura.prather@haynesboone.com | 7/2/2025 9:11:04 AM | SENT |
| Pauline Sisson | | pauline.sisson@oag.texas.gov | 7/2/2025 9:11:04 AM | SENT |
| Michael Lambert | | michael.lambert@haynesboone.com | 7/2/2025 9:11:04 AM | SENT |
| Carey Wallick | | carey.wallick@haynesboone.com | 7/2/2025 9:11:04 AM | SENT |
| Hannah Keck | | hannah.keck@haynesboone.com | 7/2/2025 9:11:04 AM | SENT |
| Scott Froman | | Scott.Froman@oag.texas.gov | 7/2/2025 9:11:04 AM | SENT |
| Christopher Molak | | christopher.molak@oag.texas.gov | 7/2/2025 9:11:04 AM | SENT |
| Matthew T.Kennedy | | matt.kennedy@oag.texas.gov | 7/2/2025 9:11:04 AM | ERROR |
| Emily Samuels | | emily.samuels@oag.texas.gov | 7/2/2025 9:11:04 AM | SENT |
| Abby Smith | | abby.smith@oag.texas.gov | 7/2/2025 9:11:04 AM | SENT |